DONALD R. YOUMANS *vs.* CYNTHIA M. RAMOS.

Worcester. December 10, 1998. - June 22, 1999.

Present: WILKINS, C.J., ABRAMS, LYNCH, GREANEY, FRIED, MARSHALL, & IRELAND, JJ.

*Guardian. Probate Court,* Guardian, Equitable Jurisdiction. *Jurisdiction,* Equitable. *Adoption,* Visitation rights. *Minor,* Visitation rights. *Constitutional Law,* Parent and child. *Words,* "De facto parent."

On the record of a proceeding in equity to determine custody of a child, a judge of the Probate and Family Court did not abuse his discretion or exceed his authority in ordering, on his own initiative and in consideration of the best interests of the child, that the eleven year old child have liberal visitation and contact with her aunt who had reared the child with the father's acquiescence [779-784], and that the father, who was awarded custody of his child out of wedlock, assume the costs of visitation [785-787]. LYNCH, J., dissenting, with whom FRIED, J., joined.

An order incident to a child custody determination, that the child continue to have access to her aunt who had acted as her only parent, was not a constitutionally impermissible interference with the rights of the father who had received custody of his out of wedlock child. [784-785] LYNCH, J., dissenting, with whom FRIED, J., joined.

COMPLAINT filed in the Worcester Division of the Probate and Family Court Department on March 4, 1997.

The case was heard by *Joseph Lian, Jr., J.*

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael J. Traft* for the plaintiff.

*Robert L. Rice, Jr. (Gregory V. Roach* with him) for the defendant.

MARSHALL, J. We consider in this case whether, attendant to a judgment awarding a father custody of his then eleven year old daughter, a judge in the Probate and Family Court may order visitation between the child and a guardian with whom she had lived for many years, and who had long filled the role of the only parent for the child.

In 1997, Donald R. Youmans (father), a resident of Georgia, sought legal and physical custody of his daughter, Tamika E.

Youmans. Tamika, who was born in 1986, had lived with Cynthia M. Ramos, her maternal aunt, in Massachusetts for most of her life. The aunt, previously appointed as Tamika's permanent guardian, sought to retain custody of Tamika. After a trial, the judge vacated the aunt's guardianship, awarded custody of Tamika to her father and, without request from the parties, ordered that Tamika visit her aunt during a school vacation each winter and for six weeks each summer, at the father's expense. He also ordered the father to permit and encourage weekly telephone contact between Tamika and her aunt.

The aunt does not appeal from the custody determination. The father challenges so much of the judgment as concerns visitation and other contacts between the aunt and his daughter. He argues that, in the absence of a statute expressly permitting the order of visitation privileges to a "nonparent," the judge had no legal authority to order the visitation, and that the order violates his liberty interest, protected by the Federal and State Constitutions, in raising his child without State interference. In the alternative, he challenges the extent of the visitation and the imposition of its costs on him. We affirm the judgment of the Probate and Family Court.

1. *Background.* We summarize the facts as found by the judge or stipulated by the parties. Tamika Youmans and her twin, Tisha, were born on March 31, 1986. Their parents, Luz Ramos (mother) and Donald Youmans, never married. Youmans and the mother met in 1982 while he was serving in the military and stationed at Fort Devens in Massachusetts. When the father was transferred to Fort Benning, Georgia, in 1984, the mother visited him, but never moved to Georgia. Tamika and Tisha were born prematurely in New York.[1] The father obtained leave and visited them in the hospital. The twins and their mother lived for a few months in Georgia before returning to Massachusetts to live near the mother's sister, Cynthia Ramos (aunt). But for those initial few months in Georgia, Tamika has lived only in Massachusetts, almost entirely with her aunt. The father has never lived in Massachusetts with his daughter.

Tisha died on February 19, 1988. She was never a healthy child, and the aunt took care of Tamika from infancy so that the

[1]There was testimony at trial that the mother was on a visit to New York when the twins were born. Although the mother was released soon after their birth, the twins remained hospitalized for some time; Tamika had a heart murmur and a collapsed left lung.

mother could care for Tisha. The mother died when Tamika was five years old, at which time the aunt became Tamika's sole caretaker.[2] According to the aunt's undisputed testimony, Tamika learned to walk, to talk, and to read in her care; the aunt arranged for Tamika's medical care; accompanied her to all of her appointments; oversaw her progress at school; took her to church every Sunday; and arranged for and participated in all of her extracurricular activities. Tamika refers to the aunt as her "mom," and to the aunt's biological children as her "brothers" and "sisters." The aunt testified that she has cared for Tamika "like a child of my own." She was in every sense Tamika's de facto parent.[3]

While the mother was alive, the father provided financial support for his twin daughters by an allotment from his military pay. In 1987, the father was transferred from Georgia to Germany. He returned to Massachusetts for five days on emergency leave to attend Tisha's funeral in 1988, at which time he also saw Tamika. He next saw Tamika in 1990 when he again visited Massachusetts. During that two-week visit, he and the mother executed a domestic relations agreement regarding Tamika's custody, support, and medical insurance. They agreed that they would share legal custody of Tamika, that the mother would continue to have sole physical custody of her, and that

---

[2]The aunt testified, without rebuttal, that before Tisha died, the mother also became ill, and her illness escalated following Tisha's death. She was hospitalized for the last six months of her life, during which time Tamika lived with her aunt.

[3]We use the terms "legal parent" and "de facto parent" proposed by the Reporters on the ALI Principles of the Law of Family Dissolution. See ALI Principles of the Law of Family Dissolution § 2.03(1) (Tent. Draft No. 3 Part 1 1998) (approved at annual meeting May, 1998). The definition of "de facto parent" states in relevant part:

> "A de facto parent is an adult, not the child's legal parent, who for a period that is significant in light of the child's age, developmental level, and other circumstances,

> "(i) has resided with the child, and

> "(ii) for reasons primarily other than financial compensation, and with the consent of a legal parent to the formation of a de facto parent relationship . . . regularly has performed

> "(I) a majority of the caretaking functions for the child."

*Id.*

the father would have reasonable visitation rights.[4] They further agreed that, if the mother were to predecease the father, he would assume physical custody of Tamika.

On May 12, 1991, Tamika's mother died. Because it is relevant to our holding, we describe in some detail the various actions and inactions relating to Tamika's custody after the death of her mother. On May 17, 1991, the aunt filed a petition for guardianship of Tamika and was appointed temporary guardian by a judge in the Probate and Family Court.[5] When the father learned of the mother's death, he came to Massachusetts from his military station in Europe on emergency leave and, on May 28, 1991, filed in the same court a separate equity petition for custody of Tamika.[6] The next day a judge issued a temporary order of visitation between the father and Tamika, appointed a guardian ad litem for the father, declined to vacate the aunt's temporary guardianship of Tamika, and declined to grant the father's request for temporary custody. The father never challenged any aspect of that order.

For reasons that are not explained, neither the father nor the father's counsel appeared at the next hearing on October 31, 1991, and the judge continued the temporary guardianship of the aunt. A report filed in November, 1991, by the father's guardian ad litem reported that the father was still living in Europe and, in a telephone conversation with his guardian ad litem, had expressed a desire for custody of Tamika.[7] The report

---

[4]According to the agreement, which was entered in evidence at the custody hearing, once Tamika reached the age of ten years, she was to spend the months of June and July with her father every year, as well as alternating Christmas holidays. The father was to assume all expenses associated with those visits.

[5]In her last will and testament, executed in January, 1991, the mother appointed her mother, Emilia Ramos (grandmother), as the guardian of Tamika. If the grandmother was unable to serve, the mother appointed the aunt as Tamika's guardian. For reasons relating to her own poor health, the grandmother waived her right to be appointed Tamika's guardian. Consistent with the mother's expressed wishes, the judge appointed the aunt Tamika's guardian. The aunt sought guardianship promptly following the mother's death so that the aunt, who receives public assistance from the Aid to Families with Dependent Children (AFDC) program, could secure benefits under her AFDC grant and from Social Security for Tamika and could ensure that Tamika continued to have medical coverage.

[6]The two actions were treated as if consolidated, with subsequent orders being entered in both actions. The father was represented by the same counsel in both proceedings.

[7]No guardian ad litem was ever appointed for Tamika. The 1991 report of

also stated that the father was eligible for leave in June, 1992, and had requested a hearing on custody at that time. On July 14, 1992, after continuances on February 20, 1992, and April 14, 1992, the aunt was appointed permanent guardian of Tamika. The father was not present at that hearing and his counsel did not appear. The father never challenged that order.

From July, 1991, until June, 1992, the father was stationed in Iraq in his capacity as a member of the armed forces in the Gulf War.[8] After returning briefly to Germany, in 1993 the father was transferred to the United States, and received an honorable discharge from the army in 1995. In the interim he had married a German national; his wife and their son moved with him to Georgia. The father made no attempt to obtain custody of Tamika, and continued to provide financial support for her by sending his payments to the aunt.[9] The father next saw Tamika in the summer of 1994, when she came to stay with him for two weeks.[10] She returned again for two visits of approximately ten days each in December of 1995 and the summer of 1996. In April, 1997, Tamika visited her father at his home in Georgia for five days.

In March, 1997, when Tamika was eleven years old, the father filed this, his second, petition in equity for custody of Tamika. He sought to terminate the aunt's guardianship of Tamika, and requested "temporary orders to facilitate the transfer of [Tamika's] custody" to him. The aunt opposed the petition. She did not seek visitation privileges in the event custody was awarded to the father. That same month, a judge issued a temporary order in this case,[11] incorporating a stipulation of the parties that

the father's guardian ad litem was attached to the father's complaint in this action and was mentioned in the parties' stipulation of facts. Although not introduced in evidence at the trial, it was relied on by the judge in his findings of fact.

[8]The father makes no claim that he was unable to communicate with his counsel, the guardian ad litem appointed to represent him, or the court during this period.

[9]The father testified that at the time of trial he had an annual income of $50,000. The aunt testified that she received $300 a month from the father.

[10]Tamika was eight years old at the time of this visit. She had last seen her father when she was five years old. The father separated from his wife in late 1993, and she and their son returned to Germany shortly thereafter. The couple were divorced in 1994.

[11]Although not consolidated, orders entered in this proceeding were docketed simultaneously in the two earlier proceedings described above. See note 6, *supra.*

provided for the father's visitation with Tamika in Georgia during the April school vacation and the summer months, and for reasonable telephone contact between father and daughter.

The trial was held on July 14, 1997. With the agreement of the parties, the judge interviewed Tamika in his chambers. There is no transcript of that interview. On August 29, 1997, the judge issued his findings of fact, conclusions of law, and judgment. He found that the father had maintained a "continuing presence" in Tamika's life, had provided financial support for her, and over the years had telephoned, written to, and periodically visited Tamika. He made further findings concerning the father's financial well-being, his living arrangements in Georgia, his planned second marriage, and his planned child care and other arrangements for Tamika. He also found that there was no evidence that the father "is unfit to assume full custodial responsibilities of Tamika." The judge vacated the aunt's appointment as permanent guardian of Tamika. However, he found that it is in Tamika's best interests to maintain contact with the aunt and the aunt's family, and, "[i]n light of the role of caretaker and guardian that [the aunt] has played in the first eleven years of Tamika's life," ordered "liberal visitation and contact" between Tamika and her aunt. He ordered the father to assume the costs of visitation because the father's financial resources "greatly exceed" those of the aunt.

2. *The statutory challenge to the visitation order.* In Massachusetts no statute expressly authorizes an aunt or former guardian of a minor child to seek visitation privileges with the child. The father argues that a judge may grant visitation rights only to persons specifically authorized by statute to receive them, and that the judge had no legal authority to order visitation between Tamika and her aunt. He points to G. L. c. 209C, pertaining to children born out of wedlock. Section 10 of that chapter,[12] he says, provides the exclusive legislative authority for custody determinations of children born out of wedlock, and

---

[12]General Laws c. 209C, § 10, states in relevant part: "(*a*) Upon or after an adjudication or voluntary acknowledgment of paternity, the court may award custody to the mother or the father or to them jointly or to another suitable person as hereafter further specified as may be appropriate in the best interests of the child . . . . (*c*) If either parent is dead, unfit or unavailable or relinquishes care of the child or abandons the child and the other parent is fit to have custody, that parent shall be entitled to custody. (*d*) If a person who is not a parent of the child requests custody, the court may order custody to that person if it is in the best interests of the child and if the written consent of

he observes that G. L. c. 209C provides no authority for visitation privileges for adults other than a biological parent.[13]

The father did not assert his claim for custody under G. L. c. 209C in the trial court. Assuming that he may invoke the chapter at this late date, G. L. c. 209C has no application to these proceedings. The purpose of that chapter is "to deal with actions to establish paternity in the context of children born out of wedlock," *C.C.* v. *A.B.*, 406 Mass. 679, 681 (1990), and to ensure that children born out of wedlock are given the same rights and protections of the law as all other children. G. L. c. 209C, § 1.[14] See *Doe* v. *Roe*, 23 Mass. App. Ct. 590, 594-595 (1987) (chapter "shows a clear intention to provide broad remedies for equal treatment for children born out of wedlock"). The chapter does not limit a judge's authority to act in accordance with a child's best interests: the "enactment of G. L. c. 209C places no limit on the Probate Court's general equity jurisdiction." *C.C.* v. *A.B.*, *supra* at 682.

The father also misapprehends the judge's order. The right (or standing) of an adult who is not a legal parent to seek visitation privileges with a minor child is not at issue in this case.[15] Tamika's aunt never sought such privileges. Rather, the judge,

---

both parents or the surviving parent is filed with the court. Such custody may also be ordered if it is in the best interests of the child and if both parents or the surviving parent are unfit to have custody or if one is unfit and the other files his written consent in court."

[13]General Laws c. 209C, § 11 (*b*), provides that the parents of a child born out of wedlock who execute a voluntary acknowledgment of parentage may make agreements regarding "custody, support and visitation," that the agreements may be filed in court, and that, if approved by the court, the agreement "shall have the same force and effect as a judgment." That section provides further "that an agreement regarding custody and visitation shall be approved only if the court finds it to be in the best interests of the child."

[14]General Laws c. 209C, § 1, provides, in pertinent part: "Children born to parents who are not married to each other shall be entitled to the same rights and protections of the law as all other children. It is the purpose of this chapter to establish a means for such children either to be acknowledged by their parents voluntarily or, on complaint by one or the other of their parents or such other person or agency as is authorized to file a complaint by [§ 5], to have an adjudication of their paternity, to have an order for their support and to have a declaration relative to their custody or visitation rights ordered by a court of competent jurisdiction."

[15]The father's reliance on cases from other States where a party other than a legal parent sought unsuccessfully to establish visitation privileges with children is, therefore, misplaced. See, e.g., *Bessette* v. *Saratoga County Comm'r of Social Servs.*, 209 A.D.2d 838 (N.Y. 1994) (former foster parents

in resolving this custody dispute, ordered continuing contact between Tamika and her aunt because he concluded that it was in the child's best interests to do so. The judge's consideration of Tamika's best interests was entirely appropriate.[16] The welfare of the child is "the controlling consideration" in custody proceedings. *Stevens* v. *Stevens*, 337 Mass. 625, 627 (1958). See *C.C.* v. *A.B.*, *supra* at 689 ("existence of a substantial parent-child relationship is . . . the controlling factor" in determining whether putative father could maintain an action in equity seek-

---

brought applications for visitation with their former foster children); *Alison D.* v. *Virginia M.*, 77 N.Y.2d 651 (1991) (woman who had live-in relationship with child's mother sought to obtain visitation rights after termination of relationship). Some States have granted such visitation privileges to an adult who acts as a de facto parent to a child. For example, in *Holtzman* v. *Knott*, 193 Wis. 2d 649, cert. denied, 516 U.S. 975 (1995), the Supreme Court of Wisconsin concluded that a nonparent can seek visitation privileges if he or she has "a parent-like relationship with the child" and that a "significant triggering event" justifies State intervention in the child's relationship with a parent. *Id.* at 658. The Wisconsin court held that to demonstrate a "parent-like relationship" with the child, a petitioner must prove "(1) that the biological or adoptive parent consented to, and fostered, the petitioner's formation and establishment of a parent-like relationship with the child; (2) that the petitioner and the child lived together in the same household; (3) that the petitioner assumed obligations of parenthood by taking significant responsibility for the child's care, education and development, including contributing towards the child's support, without expectation of financial compensation; and (4) that the petitioner has been in a parental role for a length of time sufficient to have established with the child a bonded, dependent relationship parental in nature" (footnotes omitted). *Id.* at 658-659. Cf. ALI Principles of the Law of Family Dissolution § 2.03(1)(b) (Tent. Draft No. 3 Part 1 1998) (approved at annual meeting May, 1998) (definition of de facto parent). See note 3, *supra*.

[16]The dissent focuses on the visitation rights of third parties — not at issue in this litigation — and does not address the best interests of Tamika, a child raised (with the father's acquiescence) by her maternal aunt for the crucial first decade of her life. Similarly, there is no hint in this record that the judge ever suggested — nor do we — that the father had "waived" his custodial rights to his daughter, and the dissent's reference to cases where such a claim has been made is inapposite. *Post* at 792. We do not intimate that the father's decision to leave his daughter in the sole custody of her aunt for more than a decade would, without more, warrant a judge to conclude that the father is "unfit to further the welfare of the child." *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 120 (1984), quoting *Bezio* v. *Patenaude*, 381 Mass. 563, 577 (1980). The fitness of the father is not an issue here. But where a legal parent permits, indeed facilitates in every way, the development of a de facto parental role for another adult with his child, the child's best interest may result in some limitation on the rights of the legal parent. See *Opinion of the Justices*, 427 Mass. 1201, 1206 (1998).

ing visitation). See also *Opinion of the Justices*, 427 Mass. 1201, 1206 (1998); *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 640 (1975); *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932); *Purinton* v. *Jamrock*, 195 Mass. 187, 199 (1907).

There was uncontested, overwhelming evidence that, with the acquiescence of the father, a substantial mother-daughter relationship had developed between Tamika and her aunt. The judge recognized that judgment of custody in favor of the father necessarily would deprive Tamika of the only parent-child relationship she has known, resulting in another significant disruption (physical, geographic, and emotional) in her young life. He was not powerless to minimize the resulting harm to Tamika. "The first and paramount duty of courts is to consult the welfare of the child." *Richards* v. *Forrest, supra* at 553. "To that governing principle every other public and private consideration must yield. Parents are the natural guardians of their minor child and entitled to its custody. But they have no absolute property right of which they can in no way be deprived without their consent. Their right will not be enforced to the detriment of the child." *Id.* See ALI Principles of the Law of Family Dissolution, § 2.02 (Tent Draft No. 3 Part 1 1998) ("[t]he primary objective . . . is to serve the child's best interests . . . [a] secondary objective . . . is to achieve fairness between the parents"). The dissent's suggestion that any adult who has "bonded" with a child — be she nanny or other caregiver — may obtain visitation rights under our holding is misplaced. *Post* at 793. There is a world of difference between the relationship of a child and a de facto parent, as the aunt most assuredly is to Tamika, and a bond with a child that any number of adults may have. Summarily removing a child from her de facto parent and the only home she has ever known is different in kind from terminating the employment of a nanny.

In *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 376 (1981), we declined to decide whether G. L. c. 210, § 3, which authorizes a judge to permit the adoption of a child without the consent of the parents, allows a judge to provide for "open adoption," i.e., postadoptive visitation by members of the child's natural family. *Id.* at 379-380 & nn.3, 5. Later, in *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 392 Mass. 696 (1984), we concluded that, although there is no statutory author-

ity for postadoption visitation, the "broad equitable powers" of courts in this area permit a judge, in his discretion, to evaluate a proposed adoption plan providing for such visitation and to decide whether visitation is in the child's best interests. *Id.* at 702-703. The judge in this case could exercise the same powers. In every case in which a court order has the effect of disrupting a relationship between a child and a parent, the question surely will arise whether it is in the *child's* best interest to maintain contact with that adult.[17] Whether such contact in any given case is wise is a matter that should be left to the discretion of the judge. See *Adoption of Nicole,* 40 Mass. App. Ct. 259, 264-265 (1996), and cases cited.[18] The evidence of the parent-child relationship and strong emotional ties between Tamika and her aunt fully warrant the judge's order, more particularly because this young girl was being moved to a new

---

[17]The dissent would limit "State intervention" to "extreme" circumstances, "such as abuse or neglect." Here, the State did not "intervene"; State action was affirmatively sought by the father, who had allowed his child to be raised by another despite clear evidence that he was in a position to assume custody of her when her mother died, had he chosen to do so. He may have had good reason to conclude that Tamika should remain with her aunt for all those years, but he cannot now complain that the State has "intervened" when it was he who invoked the State's authority to obtain custody of Tamika.

[18]We do not construe G. L. c. 119, § 39D, as appearing in St. 1991, c. 292, granting visitation privileges to certain grandparents of minor children, to preclude in all other circumstances an order of visitation between a child and an adult other than a legal parent. That statute does not limit the scope of the equity jurisdiction of the Probate Court. Cf. *C.M.* v. *P.R.,* 420 Mass. 220, 223 (1995). Courts in other jurisdictions have reached the same result. See *Michaud* v. *Wawruck,* 209 Conn. 407 (1988) (not against public policy to enforce agreement for postadoption visitation rights in best interests of child even when child was adopted by persons other than biological relatives or stepparents); *Rogers* v. *Trent,* 594 A.2d 32 (Del. 1991) (visitation with great-aunt and uncle ordered for child placed in father's custody not abuse of discretion even though no statutory authorization); *In re Custody of D.M.M.,* 137 Wis. 2d 375 (1987) (statute authorizing court to order visitation for parents, grandparents and great-grandparents did not deprive trial court of authority to grant visitation rights to great-aunt who previously had custody of child). In *Rogers* v. *Trent, supra* at 34, the Supreme Court of Delaware concluded that the Family Court could fashion a "visitation scheme involving third parties if it determines it is in the best interests of the child to do so." The court observed that "to determine how the welfare of the child will best be served, the court must be sensitive to the emotional trauma implicit in relocating a child of tender years from surroundings in which he or she has advanced and benefitted." *Id.*

environment to live with a man with whom she had spent precious little time in her life.

3. *The constitutional challenge to visitation.* On appeal the father argues that the order for visitation violates his rights under the Federal and Massachusetts constitutions to raise his child free from State interference. The liberty interest of a parent in his relationship with his child is fundamental. *Opinion of the Justices, supra* at 1203, and cases cited. That interest is protected by art. 10 of the Massachusetts Declaration of Rights and the due process clause of the Fourteenth Amendment to the United States Constitution. *Id.,* citing *Department of Pub. Welfare* v. *J.K.B.,* 379 Mass. 1, 3 (1979).[19] In *Opinion of the Justices, supra* at 1203, the Justices explained that a parent's interest in his relationship with his child is not absolute, because the "overriding principle" in determining the right of a parent to custody "must be the best interest of the child." *Id.,* quoting *C.C.* v. *A.B., supra* at 691. "Although parents have a fundamental, constitutionally protected interest in their relationships with their children, attainment of the children's best interest may involve some limitation on the liberties of one or the other of the parents." *Opinion of the Justices, supra* at 1206. A parent's "desire for and right to 'the companionship, care, custody, and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.' " *Lassiter* v. *Department of Social Servs. of Durham County,* 452 U.S. 18, 27 (1981), quoting *Stanley* v. *Illinois,* 405 U.S. 645, 651 (1972). Here, Tamika's interest in continuing to have access to the only adult who has acted as a parent to her is powerful. The integrity of Tamika's family — the only family she knows — has been destroyed through no fault of her "mom." Tamika is entitled to be protected from the trauma caused by the disruption of that relationship.[20] See *Opinion of the Justices, supra* at 1208; *Adoption of a Minor,* 343 Mass. 292, 294-295 (1961). In this case,

---

[19]Cf. *Stanley* v. *Illinois,* 405 U.S. 645, 651 (1972) ("The integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment, *Meyer* v. *Nebraska,* [262 U.S. 390, 399 (1923)], the Equal Protection Clause of the Fourteenth Amendment, *Skinner* v. *Oklahoma,* [316 U.S. 535, 541 (1942)], and the Ninth Amendment, *Griswold* v. *Connecticut,* 381 U.S. 479, 496 [1965] [Goldberg, J., concurring]").

[20]We recognize a child's vulnerability when the bonds with an adult who acts as a de facto parent are broken. "When a child is placed by its parent . . . in a good family the inevitable consequence will be that firm bonds of

the father acquiesced for many years to his daughter's living with her aunt, permitting the development of a de facto parent role for the aunt. Even if we assume that the father's military posting in Europe made exercise of his custodial rights difficult to pursue — and there is scant, if any, evidence of that — four years passed after his return to the United States before he sought custody of his daughter. Four years is an eternity in the life of a young child. The judge heard the unchallenged testimony regarding Tamika's affection for and reliance on her aunt as a parent. Her father, in contrast, was a "continuing presence" but nonetheless a distant figure in Tamika's life.[21] In these circumstances, an order ensuring that Tamika will continue to have contact with her aunt is not a constitutionally impermissible interference with the father's rights.

4. *Adequacy of the findings.* The father argues that, even if the judge had the power to order visitation, there is no "factual basis" and insufficient factual findings to justify the extent of the visitation or the order requiring the father to pay the costs of visitation. The judge's conclusion that, confronted with a disruptive move to a new home hundreds of miles away, it is in Tamika's best interests to maintain contact with her de facto parent and family, is fully supported. See *C.C.* v. *A.B.*, 406 Mass. 679, 690 (1990), quoting *R.R.K.* v. *S.G.P.*, 400 Mass. 12, 21 (1987) (Liacos, J., concurring) ("existence or nonexistence of a substantial relationship between the putative father and child is relevant in evaluating both the rights of the parent and the best interests of the child"); *Adoption of Lars*, 46 Mass. App. Ct. 30, 33 (1998) (limited postadoptive visitation held to be in best interests of children given "ongoing relationship and bonding between the [biological] mother and each of the

affection and confidence will rapidly arise on both sides. The damage to the child, who cannot understand what is happening, from breaking these bonds is something which even competent psychiatrists may be unable to predict. In the absence of compelling statutory command, such a breach should not be permitted lightly at the request of either of the natural parents who had their chance to take care of the child themselves and who themselves have created the unfortunate situation. The interests of the natural parents in such a case must be completely subordinated to the permanent interest of the child." *Adoption of a Minor*, 343 Mass. 292, 296 (1961), quoting *Adoption of a Minor*, 338 Mass. 635, 643 (1959). See generally ALI Principles of the Law of Family Dissolution, *supra* at § 2.02.

[21]At trial, the father was unable to recognize or identify the names of Tamika's best friends, pets, and teachers. He also misidentified the denomination of the church she had attended for over ten years.

children"); *Cennami* v. *Department of Pub. Welfare*, 5 Mass. App. Ct. 403, 409 (1977), quoting *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 645 n.12 (1975) ("duration of . . . custody as it bears on 'the putative emotional shock to the child of transfer may be an important factor in the calcul[ation]' of the best interests of the child").

As to the scope of the visitation, the judge considered the nature and the duration of the relationship between Tamika and the aunt. He interviewed Tamika in his chambers. He considered the evidence of the arrangements for visitation between the aunt and the father that had been in effect while Tamika lived in Massachusetts. The father testified that he would not object to Tamika's visits with her aunt. The visitation order mirrors almost exactly the visitation arrangements agreed to by the father and the mother for Tamika's visits to her father, and is substantially similar to the arrangements stipulated by the father and the aunt at the commencement of this litigation. On this record, ordering Tamika to visit her aunt for six weeks during the summer and one week during the winter vacation is not unreasonable.[22]

The record also supports the judge's order that in this case the father should assume the costs of the visitation between Tamika and the aunt.[23] His long acquiescence in his daughter's living with her aunt led to the development of the child's close

[22]The father argues that the judge failed to address "differences in parental style" between the father and the aunt, as well as differences in their life-styles. The father made no such claim at the trial. His argument is hard to square with his long acquiescence in his daughter's living with the aunt in the very environment he now criticizes. The differences in parental lifestyles may be real, and, contrary to the suggestion by the dissent, we do not minimize them. In our judgment the trial judge appropriately focused on the best interests of Tamika, and the dissent does not question the judge's finding that the visitation is in Tamika's best interests. It is incumbent on the adults — the father and the aunt — to work together to ensure that Tamika not be pulled in different directions or otherwise suffer emotional trauma because the father holds different and strong views about the appropriate way to raise a child.

[23]On appeal the father makes a fleeting argument that the order requiring him to pay the transportation costs for the visits deprives him of his property in violation of the Fourteenth Amendment to the United States Constitution and art. 10 of the Massachusetts Declaration of Rights. His conclusory claim does not constitute adequate appellate argument, and we do not consider it. See *Beaton* v. *Land Court*, 367 Mass. 385, 389-390 (1975); Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).

bond with her aunt. It is not the aunt's interests that the visitation order protects, but Tamika's interests. The child is the one who is at risk of emotional damage because of her father's belated claim of custody. The aunt has fulfilled a role that the father chose not to assume. We see no reason why the aunt should now have to assume any further financial obligations. Moreover, there was evidence that the father's income is $50,000, more than two and one-half times that of the aunt. The father supports one other child, his son in Germany, while the aunt is the primary financial provider for her four children; her income is low, and there is nothing to suggest that she could in fact pay for the travel expenses involved. In the past the father agreed to pay the transportation costs for Tamika's travel between Massachusetts and Georgia, and the father makes no claim that these costs were a hardship for him.

The best interests standard presents the trial judge "with a classic example of a discretionary decision." *Adoption of a Minor (No. 2)*, 367 Mass. 684, 688 (1975). "Standards of mathematical precision are neither possible nor desirable in this field; much must be left to the trial judge's experience and judgment. Underlying each case are predictions as to the possible future development of a child, and these are beyond truly accurate forecast." *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption, supra* at 646. The judge in this case had ruled on the parties' earlier requests for relief. At trial he had an opportunity to observe both the father and the aunt. He interviewed Tamika. He was in the best position to determine the arrangements that would best serve Tamika's interests as she deals with another major disruption in her young life.

As Tamika matures and becomes established in her new life, her needs and wishes may change. Counsel have apprised us of what appear to be continuing differences between the father and the aunt. The judge, in his discretion, may determine that a further hearing would be helpful to determine whether visitation between Tamika and her Massachusetts family continues to be in her best interests.

*Judgment affirmed.*

Lynch, J. (dissenting, with whom Fried, J., joins). The court

today decides that a Probate and Family Court judge has the authority to order visitation privileges to a child's aunt, over the objection of her biological father, who has custody, if the judge determines that it is in the child's best interest. The court concedes that there is no statute in the Commonwealth authorizing an aunt or former guardian to seek visitation rights, and acknowledges that a parent has a fundamental right to raise his child without interference which "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Ante* at 784, quoting *Lassiter* v. *Department of Social Servs. of Durham County*, 452 U.S. 18, 27 (1981). Nevertheless, the court concludes that the Legislature did not intend G. L. c. 119, § 39D, the statute granting visitation privileges to certain grandparents, to preclude, in other circumstances, an order of visitation between a child and a nonparent. *Ante* at 783 n.18. The court bases its conclusion on the Probate Court's general equity jurisdiction and relies on the doctrine of de facto parenthood, a concept which we have never before recognized.

Although Probate Court judges have broad equitable powers, these powers are not infinite. In *Enos* v. *Correia*, 38 Mass. App. Ct. 318, 323 n.11 (1995), quoting R.W. Bishop, Prima Facie Case, Proof and Defense § 1262 (3d ed. 1987), the Appeals Court recognized that "matters of equity jurisprudence include 'cases in which the subject matter of the controversy is one recognized by the courts at common law, but in which the remedy at law is not plain, adequate and complete.' " Third parties do not have a common-law right to visitation. Even though this court has not previously directly confronted this issue, other jurisdictions have concluded that, absent express statutory authority, a nonparent may not be granted visitation rights over the objection of the custodial parent. See *Secola* v. *Phillips*, 652 So. 2d 1259 (Fla. Dist. Ct. App. 1995) (affirming denial of visitation rights, despite contention that visitation would be in child's best interest, where there is no statutory authority or other authority granting court with jurisdiction to order such visitation rights); *Moore* v. *Trevino*, 612 So. 2d 604, 608-609 (Fla. Dist. Ct. App. 1992) (holding that court erred in granting child's paternal aunts visitation rights where no authority provided such rights, and where mother objected); *Lihs* v. *Lihs*, 504 N.W.2d 890, 893 (Iowa 1993) (court ruled that, despite the fact that it was in child's best interest, court had no common-law or statutory authority to mandate visitation with third par-

ties); *LaPointe* v. *Menard*, 412 So. 2d 223, 228 (La. Ct. App. 1982) (maternal aunt and her husband could not be granted visitation rights, absent statutory authority, despite fact that child lived with them for seven years, when mother regained custody). Notably, some jurisdictions which grant visitation privileges to third parties have broader enabling statutes. See *Henry* v. *Henry*, 665 So. 2d 87, 88 (La. Ct. App. 1995) (statute permitting rights under "extraordinary circumstances" to a relative by blood or affinity[1]); *Hollingsworth* v. *Hollingsworth*, 34 Ohio App. 3d 13, 17 (1986) (statute permitting visitation rights "to any other person having an interest in the welfare of the child"); *Thrift* v. *Baldwin*, 23 Va. App. 18 (1996) (statute permitting visitation for any party with "legitimate interest"). In this Commonwealth the only authority, statutory or otherwise, which provides the grant of visitation privileges to blood relatives, pertains solely to grandparents. G. L. c. 119, § 39D.

The fact that the Legislature has provided visitation privileges in certain limited circumstances to a child's grandparents evidences its recognition that visitation privileges of third par-

---

[1] The visitation statute the Louisiana court relied on was La. Civ. Code art. 136(B), which provided:

"Under extraordinary circumstances, a relative, by blood or affinity, not granted custody of the child may be granted reasonable visitation rights if the court finds that it is in the best interest of the child. In determining the best interest of the child, the court shall consider:

"(1) The length and quality of the prior relationship between the child and the relative.

"(2) Whether the child is in need of guidance, enlightenment, or tutelage which can best be provided by the relative.

"(3) The preference of the child if he is determined to be of sufficient maturity to express a preference.

"(4) The willingness of the relative to encourage a close relationship between the child and his parent or parents.

"(5) The mental and physical health of the child and the relative."

Article 136(B) was amended by 1995 La. Acts No. 57, effective August 15, 1995, to include a former stepparent or step-grandparent. *Henry* v. *Henry*, 665 So. 2d 87, 88 (La. Ct. App. 1995).

While this jurisdiction differs greatly from ours, the rationale remains the same. This statute requires the judge to consider the relationship of the child, parent, and third party before granting such rights. It specifically requires a finding that the third party will be likely to encourage a close relationship between the child and the parent. The Louisiana law incorporates a multitude of factors conspicuously absent in the court's analysis.

ties do not exist without statutory authorization.[2] The Appeals Court has construed this statute and reached a similar conclusion. *Enos* v. *Correia, supra* at 323, quoting *Bay State Gas Co.* v. *Local No. 273, Util. Workers Union of Am.,* 415 Mass. 72, 75-76 (1993).[3] Furthermore, we have opined that "[i]t is the function of the court to construe a statute as written and an event or contingency for which no provision is made does not justify judicial legislation." *Alguila* v. *Safety Ins. Co.,* 416 Mass. 494, 499 (1993), quoting *Prudential Ins. Co.* v. *Boston,* 369 Mass. 542, 547 (1976).

The court makes several references to the child's aunt as a "de facto parent," but falls short of expressing whether it is adopting that concept. We have never before recognized such a concept and ought not to now. Indeed, in an analogous case arising under G. L. c. 209C, we stated that a nonparent's "devotion to the child does not, without more, permit an adjudication of . . . visitation privileges." *C.M.* v. *P.R.,* 420 Mass. 220, 223 (1995). In discussing the court's equitable powers, we opined: "When a [woman] is neither the biological or adoptive [mother]

---

[2]Grandparents of an unmarried minor child may seek reasonable visitation rights, pursuant to G. L. c. 119, § 39D, when the parents are living apart under a temporary order or judgment of separate support, following the divorce of the parents or after the death of either or both of the parents. See C.P. Kindregan, Jr. & M.L. Inker, Family Law and Practice § 48.2 (2d ed. 1996).

[3]In *Enos* v. *Correia,* 38 Mass. App. Ct. 318, 322-323 (1995), the Appeals Court held that the clear language of the grandparent visitation statute, G. L. c. 119, § 39D, precludes any grandparent of a child born out of wedlock from seeking visitation where paternity has not been adjudicated or acknowledged. The court conceded that it would be consistent with the general trend to construe the statute in a manner to decrease limitations on standing. Yet, the court concluded a court "may not judicially expand the language of the statute beyond its plain and ordinary meaning," and "invit[ed] the attention of the Legislature to what may have been an oversight in failing to make some provision for maternal grandparents of children born out of wedlock." *Id.* at 323.

Although the court based its decision on statutory construction, it briefly noted the plaintiff's argument that the court should grant visitation rights under its general equity jurisdiction. The court reasoned that, because there is no common-law right to grandparent visitation and because the Legislature has already provided a specific statutory remedy, an argument based on the court's equity jurisdiction would be unavailing. *Enos* v. *Correia, supra* at 323 n.11, quoting R.W. Bishop, Prima Facie Case § 1262 (3d ed. 1987) (noting that matters of equity jurisprudence include "cases in which the subject matter of the controversy is one recognized by the courts at common law, but in which the remedy at law is not plain, adequate and complete").

nor married to the [father], there is little authority that supports a claim of a right to visitation or custody." *Id.* at 224. Furthermore, even if we were to recognize the concept, whether de facto status exists is a question of fact which should be decided by the lower court — not for the first time on appeal. The long-standing jurisprudence of the Commonwealth has been to deny custody and visitation rights to third parties unless extreme circumstances exist, such as abuse or neglect.[4] " 'State intervention in the parent-child relationship is justified only when parents appear unable to provide for their children's care and protection.' *Custody of a Minor (No. 1),* [377 Mass. 876, 882 (1979)]. . . . In that sense, the fitness of parents and the best interests of the child are related. . . . '[T]he critical question is whether the natural parents are currently fit to further the welfare and the best interests of the child.' *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* [383 Mass. 573, 589 (1981)]." *Custody of a Minor,* 389 Mass. 755, 765-766 (1983).[5] See *Custody of a Minor (No. 1), supra* at 882 n.5, quoting G. L. c. 119, § 1, as amended through St. 1972, c. 785, § 5 (Legislature's intent behind G. L. c. 119, is to "provide substitute care of children only when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development"). Yet the court circumvents this policy by declaring that visitation rights of third parties are not at issue in this case, preferring to frame the controversy as one determined by the best interests of the child. However, we have recognized that "[n]either the 'parental fitness' test nor the 'best interests of the child' test is properly applied to the exclusion of the other. . . . [The two tests] 'reflect different degrees of emphasis on the same factors . . . . [T]he tests are not separate and distinct but cognate and connected.' " *Petition of the Dep't of*

[4]The United States Supreme Court has similarly recognized that the right to raise one's child "undeniably warrants deference and, absent a powerful countervailing interest, protection." *Stanley* v. *Illinois,* 405 U.S. 645, 651 (1972).

[5]See *Custody of a Minor,* 389 Mass. 755, 765 (1983), quoting *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass. 573, 589 (1981) ("[T]he unfitness standard must be applied whenever the State seeks to terminate parents' rights to the custody of their minor children, whether the State proceeds under the care and protection statute [G. L. c. 119, §§ 23-29], the guardianship statute [G. L. c. 201, § 5], or the adoption statute [G. L. c. 210, § 3]").

*Pub. Welfare to Dispense with Consent to Adoption,* 383 Mass.
573, 591 (1981), quoting *Bezio* v. *Patenaude,* 381 Mass. 563,
576 (1980). The grant of visitation privileges to a third party,
over the objection of the natural parent, unnecessarily interferes
with a parent's fundamental right to custody and control of
one's child. See *Allison D.* v. *Virginia M.,* 77 N.Y.2d 651, 656-
657 (1991) (to allow mother's former partner visitation with
child would impermissibly impair mother's right to custody and
control of her child). Absent an allegation of parental unfitness,
a natural parent should have the right to determine what he
believes is in his child's best interest.[6]

The court attempts to justify its abrogation of parental rights
on the ground that the father initiated court intervention by
seeking custody. By doing so, the court renders a natural parent
vulnerable to infringement of his parental rights by merely
seeking custody of his child. Moreover, the court places undue
emphasis on the father's acquiescence in allowing the child's
maternal aunt to serve as guardian. In effect, the court tacitly
adopts a theory of waiver that we have previously rejected. In
*Bezio* v. *Patenaude,* 381 Mass. 563, 575 (1980), we denied a
guardian's contention based on the theory that a mother's
voluntary assent to a guardianship petition constituted a waiver
of her natural custodial rights, and stated, "The appointment of
a guardian did not diminish the weight accorded to the natural
bond between parent and child." *Id.* While a lengthy separation
is a relevant factor in determining whether the child would be
harmed in returning custody to the natural parent, "parents do
not relinquish their right to custody by choosing a caretaker
proxy." *Custody of a Minor,* 389 Mass. 755, 768 (1983), and
cases cited. "Mere failure to exercise custodial rights in the

---

[6]In *Cooper* v. *Merkel,* 470 N.W.2d 253, 255-256 (S.D. 1991), the court
analogized the right to custody with the right to visitation, stating:

> " 'The right of visitation derives from the right of custody and is
> controlled by the same legal principles.' 59 Am. Jur. 2d Parent and
> Child § 36 (1987). . . . It follows that in order to grant a nonparent
> visitation rights with a minor child over the wishes of a parent, a clear
> showing against the parent of gross misconduct, unfitness or other
> extraordinary circumstances affecting the welfare of the child is
> required."

See *D.G.* v. *D.M.K.,* 557 N.W.2d 235, 243 (S.D. 1996), and cases cited
(" 'Extraordinary circumstances' denotes more than a simple showing that
visitation would be in the child's best interest").

past, particularly where a parent has voluntarily relinquished custody 'for appropriate reasons' [*Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 640 (1975)], does not support a conclusion that such parent is unfit to further the welfare of the child." *Petition of the Dep't of Social Servs. to Dispense with Consent to Adoption*, 391 Mass. 113, 120 (1984), quoting *Bezio* v. *Patenaude*, *supra* at 577. See generally *Malkin* v. *Pine*, 351 Mass. 358 (1966) (parent who relinquished custody to guardians for approximately two years not found unfit); *Duclos* v. *Edwards*, 344 Mass. 544 (1962) (parent who relinquished custody to a guardian for approximately ten years not found unfit); *Perkins* v. *Finnegan*, 105 Mass. 501 (1870) (parent who relinquished custody to a guardian for approximately six years not found unfit).[7]

We ought to leave it to the Legislature to determine whether visitation rights should be extended to third parties and under what conditions.[8] In undertaking to expand the court's role in the absence of such legislation, the Probate Court is left with no clear guidelines for the determination of the right to visitation, other than the amorphous "best interests of the child" standard.[9] Under this analysis, any domestic partner, caregiver, or nanny who has bonded with the child could obtain visitation rights. Furthermore, under this standardless principle, what would prevent a court from ordering visitation with a religious leader, teacher, mentor, or friend if the judge perceived it to be in the best interests of the child?

---

[7]"The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State." *Santosky* v. *Kramer*, 455 U.S. 745, 753 (1982).

[8]In *Holtzman* v. *Knott*, 193 Wis. 2d 649, 729, cert. denied, 516 U.S. 975 (1995) (Steinmetz, J., concurring in part and dissenting in part), this same concern was voiced: "Wisconsin now has two areas of family law, and persons seeking visitation can apparently choose the area that best suits them. One area of family law is declared by the legislature, representing the will of the people of this state. The other area of family law is declared by four justices of this court, representing only their own wills and moral views."

[9]See *Quilloin* v. *Walcott*, 434 U.S. 246, 255 (1978), quoting *Smith* v. *Organization of Foster Families*, 413 U.S. 816, 862-863 (1977) (Stewart, J., concurring in the judgment) ("Due Process Clause would be offended '[i]f a State were to attempt to force the breakup of a natural family . . . for the sole reason that to do so was thought to be in the children's best interest' "); *Moore* v. *East Cleveland*, 431 U.S. 494, 502 (1977) (mere vote of majority of a court regarding child's best interests can be danger to due process).

The court also fails seriously to consider the father's contention that the differences in parental style may adversely affect his relationship with his daughter. See *Lihs* v. *Lihs*, 504 N.W.2d 890, 892 (Iowa 1993) ("[C]ourts that give a custodial parent veto power do so on the basis that judicial enforcement of additional visitation would divide and thereby hamper proper parental authority, force the child into the midst of a conflict of authority and possible ill feelings between the parent and other persons, and coerce what should remain a moral obligation rather than a legal obligation"). The court exacerbates this abuse of judicial power by affirming the order requiring the father to pay the necessary travel expenses incurred by the aunt in exercising court-ordered visitation. Thus the court not only endorses an unwarranted interference with parental rights, it requires the parent to subsidize an arrangement of which he disapproves and which has the potential of creating conflict and estrangement with his child. Modern social mores have forced the courts to arbitrate difficult disputes involving divorce, custody, abuse, and neglect which require interference with family relationships either to break an impasse or to prevent harm. We ought to recognize, however, that courts are not the font of all wisdom, especially where raising children is concerned, and we ought to be reluctant to impose our view of proper parenting in situations that do not demand a judicial solution. We also ought not forget that the legislative process which involves public debate, the distillation of many points of view, and many checks and balances is to be preferred over judicial ukase where the decision has passed beyond that of adjudicating disputes and intrudes on intimate interpersonal relationships.

I cannot agree that a court can award visitation rights to nonparents over the objection of a surviving custodial parent in the absence of legislation or evidence of abuse or neglect. Furthermore it is beyond the pale to suggest that, not only does that power exist, but in addition the court may draw against the assets of the objecting parent in the furtherance of its scheme.

I, therefore, respectfully dissent.