NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-1169

ADOPTION OF NIGEL.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother appeals from a decree issued by a judge of the Juvenile Court finding her unfit, terminating her parental rights to her son, Nigel, and declining to order posttermination visitation. We affirm.

Background. We summarize the judge's findings of fact, supplemented by uncontroverted evidence from the record.

Nigel was born in 2012. Four days after his birth, the Department of Children and Families (department) filed the first of three care and protection petitions on behalf of Nigel after he showed symptoms of drug withdrawal and based on concerns with the mother's history of substance abuse and mental health issues.[2] After the seventy-two hour hearing, custody was

---

[1] A pseudonym.

[2] The mother began drinking alcohol at eleven years old. She has a history of opiate addiction, cocaine use, and abuse of prescription drugs that dates to her mid teenage years. The mother has suffered from anxiety, depression, bipolar disorder,

returned conditionally to the mother and father, and the case was dismissed five months later.

In summer 2013, Nigel was evaluated by early intervention services for "delays in personal-social communication, motor and cognitive development." He was referred for further evaluation and services. Although the mother took Nigel to his evaluation, thereafter she failed to "follow through with vital early intervention services" and "neglected" Nigel's speech and behavior issues.

In July 2016, the mother was stopped by police while driving a car apparently under the influence of an "unknown substance." Nigel was in the vehicle, and police found heroin and a syringe on the front passenger floor. When department social workers visited the mother's home the following day, it was "extremely filthy and cluttered," causing safety concerns for the child. Nigel was observed to be "dirty," "wearing dirty clothing," and "his hair was matted." The department took emergency custody of Nigel.

While in the department's custody, Nigel was diagnosed with autism spectrum disorder. The doctor opined that Nigel met "the criteria of a child who has posttraumatic stress disorder and [was] at risk for dysregulated behavior and additional emotional

---

and posttraumatic stress disorder at different points in her life.

2

psychiatric problems as he gets older." He also reported that Nigel's behaviors indicated a lack of "any parenting of any consistent quality." Approximately one year later, Nigel was returned to his parents' care, and the petition was dismissed by agreement of the parties. The department remained involved with the family.

In October 2017, Nigel's father died unexpectedly in a work accident. To assist with the traumatic impact of this tragedy, the department assigned a family partner to work with the mother and referred her to grief counselling. The department also arranged for the mother's adult daughter to assist with Nigel's care. The daughter got Nigel ready for school, provided transportation to his appointments, brought the mother to her drug treatment, and facilitated communication between the mother and the department. In effect, the daughter became Nigel's primary caretaker. On occasions when the daughter was not available, the mother failed to bring Nigel to medical appointments and had difficulty getting him ready for school. Eventually, the daughter withdrew from her caretaker role.

Beginning in December 2018, a series of G. L. c. 119, § 51A reports (51A reports), were filed against the mother based on reports of domestic violence, substance abuse, and mental instability while caring for Nigel. Nigel's school also reported numerous absences and daily tardiness. In March 2019,

a department emergency response worker visited the mother's home and discovered "garbage, toys, papers, clothing, and misc. items scattered on every surface and floor between the kitchen, living room, and bedroom."  Although the house was "significantly cleaner" the following day, within one month a department social worker observed that "the home was again messy and disorganized, food was on the wall, and dried dog feces was on the floor. The child wore dirty clothes and [had] a dirty face."

The department filed this care and protection petition in April 2019 after a 51A report alleged that the mother tested positive for unprescribed benzodiazepines, was seeking benzodiazepines from other patients at her treatment clinic, and that Nigel had missed a physical examination and was two years behind in dental visits.  The department took emergency custody and placed Nigel in a kinship foster placement with his maternal grandparents.

After Nigel's removal, the department met with the mother multiple times to discuss her action plan with the goal of reunification.  The department referred the mother for services for her own substance use and mental health issues as well as to help her understand Nigel's autism diagnosis.  The department also invited the mother to participate in medical appointments and school meetings after Nigel was placed with the

grandparents.[3]  However, the mother failed to produce a relapse prevention plan, did not execute a parenting plan or obtain a parental fitness evaluation, and did not follow through with a referral for a medication evaluation.  In January 2020, the department created a tiered reunification plan aimed at gradual increases in visitation to help reunify the mother and Nigel.  The department asked the mother to maintain a safe home, comply with her methadone program, take drug screens, create a parenting plan, and allow the department into her home to monitor her progress.  In early March 2020, based on the mother's failure to make timely progress toward completion of these goals, the department changed Nigel's permanency goal to adoption.

Following a trial held on several dates between February 18, 2021 and August 19, 2021,[4] the judge found the mother unfit, adjudicated Nigel to be in need of care and protection, terminated the mother's parental rights, and declined to order posttermination visitation between the mother and Nigel.  This appeal followed.

---

[3] The judge acknowledged and considered that the department failed to invite the mother to one of Nigel's individualized education program meetings.  She determined that this failure did not prevent a finding that the department engaged in reasonable efforts to reunify the mother and Nigel.
[4] The trial was conducted virtually via Zoom during the COVID-19 pandemic.

Discussion. 1. Termination of parental rights. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Oren, 96 Mass. App. Ct. 842, 844 (2020). "[T]he 'parental fitness' test and the 'best interests of the child test' are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.'" Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Care & Protection of Three Minors, 392 Mass. 704, 714 (1984). In making this determination, the judge considers "'the ability, capacity, fitness and readiness of the child's parents' as well as 'the plan proposed by [the department].'" Adoption of Garret, supra at 675, quoting Adoption of Nancy, 443 Mass. 512, 515-516 (2005).

The parent's fitness is determined by taking into consideration a parent's "capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). "The inquiry is whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child'" (citation omitted). Adoption of

6

Olivette, 79 Mass. App. Ct. 141, 157 (2011). "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is clear error of law or abuse of discretion." Adoption of Ilona, 459 Mass. 53, 59 (2011).

The mother argues that the judge erred in her analysis of Nigel's best interests by finding that she is unfit, finding that DCF provided reasonable reunification efforts, failing to consider evidence of her bond with Nigel, and relying on stale evidence. We disagree.

a. The mother's unfitness. The mother's unfitness resulted from a "constellation of factors." Adoption of Greta, 431 Mass. 577, 588 (2000). Her recurring substance abuse and mental health struggles affected the mother's capacity to assume parental responsibility and fulfill the needs associated with Nigel's disabilities. See Adoption of Frederick, 405 Mass. 1, 9 (1989) ("Mental disorder is relevant only to the extent that it affects parents' capacity to assume parental responsibility"). The mother's substance abuse resulted in Nigel suffering drug withdrawal symptoms at birth. She exposed him to unsanitary home conditions, endangered him by driving a car while under the influence, exposed him to domestic violence, and repeatedly failed to attend to Nigel's basic hygienic, medical, and

7

educational requirements.  Moreover, the mother neglected Nigel's special needs to a degree that it exacerbated his developmental delays.

Despite the department's intervention over the course of three care and protection cases, the mother failed consistently to participate in services and treatment to address the issues that caused the removal of her child.  See Adoption of Serge, 52 Mass. App. Ct. 1, 8 (2001) ("The mother's lack of meaningful participation in recommended services was also relevant to the question of her fitness").  We agree with the judge's determination that the mother failed to take responsibility for actions that created neglectful conditions and endangered Nigel. The judge found that the mother could not articulate how her inconsistency with services, both for herself and for Nigel, negatively impacted her ability to meet Nigel's needs.

We are mindful of the challenges the mother has faced since she was a teenager.  However, regardless of the underlying causes of the mother's circumstances, we discern no abuse of discretion in the judge's determination that her unfitness would persist, and therefore termination of her rights was in Nigel's best interests.  See Adoption of Cadence, 81 Mass. App. Ct. 162, 169 (2012) ("Where there is evidence that a parent's unfitness is not temporary, the judge may properly determine that the

child's welfare would be best served by ending all legal relations between parent and child").

   b. _Reunification efforts_. Before terminating parental rights, the judge must determine whether the department engaged in reasonable efforts to support the family to allow the child to be returned to the parent's care. See _Adoption of West_, 97 Mass. App. Ct. 238, 242 (2020). The mother argues that the department failed to engage in reasonable efforts to reunify because some of the items on her action plan could not be completed while she did not have custody of Nigel.[5] However, most of her tasks did not require custody, and she failed to engage with the action plan or demonstrate behavioral changes. We therefore agree with the judge's determination that the department made reasonable efforts to reunify Nigel and the mother. Even if the department had not made reasonable efforts to reunify, it remained within the trial judge's sound

---

[5] The mother asserts that more than one action plan was backdated to a time either before the relevant social worker was assigned to her case or before the social worker worked for the department. A review of the record indicates that action plans may have been backdated. However, this issue was not raised at trial and thus has not been fully vetted. Although we express concern about such a practice if it occurred, it is not determinative of the outcome in this case. See _Adoption of Mary_, 414 Mass. at 712 ("Generally, issues not raised by a losing party in the trial court are not addressed on appeal, absent exceptional circumstances").

discretion to determine that termination of parental rights is within Nigel's best interests.  See id.

c.  The child's bond with the mother.  We are not persuaded by the mother's argument that the judge did not give sufficient weight to the bond between Nigel and the mother when determining that termination of her parental rights was in his best interests.  The judge recognized Nigel's relationship with the mother, specifically finding that the mother loves Nigel, is bonded with him, and Nigel enjoys her visits.  We are satisfied on the record in this case that the judge did not abuse her discretion by weighing this evidence and concluding that, despite this relationship, termination of the mother's parental rights was in Nigel's best interests.  See Adoption of Bianca, 91 Mass. App. Ct. 428, 432 (2017).

d.  Staleness of the evidence.  Although stale information cannot be the basis for determining unfitness, the mother's "prior parental conduct is deemed relevant in assessing the parent's capacity and ability to care for the child."  Adoption of Jenna, 33 Mass. App. Ct. 739, 744 (1992).  The mother argues that the judge relied on stale information to determine that she is unfit because some of the judge's 437 findings are based on information from years before this case.  However, the evidence demonstrated that the mother's historic challenges persisted at the time of trial.  Moreover, the judge was careful to recognize

10

history that was admissible only to "set [the] stage," to disregard inadmissible "opinions, conclusion[s], and judgements," and to consider only the nonhearsay content of this evidence.

2. _Parental visitation_.  "In terminating parental rights pursuant to G. L. c. 210, § 3, the Juvenile Court judge has equitable authority to order visitation between a child and a biological parent where such contact is in the best interests of the child."  _Adoption of Garret_, 92 Mass. App. Ct. at 679. "Whether such contact in any given case is wise is a matter that should be left to the discretion of the judge."  _Youmans_ v. _Ramos_, 429 Mass. 774, 783 (1999).  "A judge should issue an order of visitation only if such an order, on balance, is necessary to protect the child's best interest."  _Adoption of Ilona_, 459 Mass. at 65.  A judge should also consider "whether a preadoptive family has been identified" and "whether the child 'has formed strong, nurturing bonds' with that family."  _Id_. at 63-64, quoting _Adoption of Vito_, 431 Mass. 550, 563 (2009).

Here, the judge found that "[Nigel] is bonded and well-cared for in his current foster home with his maternal grandparents and extended family."  Although the judge, as noted above, recognized the bond between the mother and Nigel, she nevertheless determined that mandated visitation was not in Nigel's best interests.  See _Adoption of Edgar_, 67 Mass. App. Ct. 368, 371 (2006) (purpose of posttermination visitation is assisting child's transition, not

11

strengthening bond between child and biological mother).  We are not persuaded by the mother's argument that the judge failed to consider evidence of the negative relationship between the mother and the maternal grandparents.  Rather, we are satisfied that the judge carefully weighed the evidence before concluding that the grandparents "have in the past, and will in the future, continue to make good choices to support all [Nigel's] needs for responsible and loving care," including visits with the mother, as long as "it serves [Nigel's] best interests."  Thus, the judge did not abuse her discretion by declining to make a specific order of visitation.  See Youmans, 429 Mass. at 783.

Decree affirmed.

By the Court (Massing, Henry & Brennan, JJ.[6]),

Joseph F. Stanton

Clerk

Entered:  October 3, 2023.

---

[6] The panelists are listed in order of seniority.