CHARLOTTE N. ROGEL, trustee, & another[1] *vs.* MIRIAM A.
COLLINSON (and a companion case[2]).

No. 00-P-367.

Suffolk. February 5, 2002. - March 25, 2002.

Present: MASON, KASS, & COHEN, JJ.

*Easement. License. Real Property,* Easement, License. *Frauds, Statute of.*
*Zoning,* Person aggrieved. *Words,* "Use."

In an action in the Land Court arising from a dispute over the right of plaintiffs
to conduct commercial horseback trail rides over neighboring property
(lots 8 and 10) owned by the defendant, which was once part of the land
where the stables that house the horses used in the trail rides were located,
the judge did not err in finding that the plaintiffs held nothing more than a
mere revocable license rather than an easement, and that the plaintiffs' at-
tempt to enforce an alleged oral easement with respect to lot 8 was barred
by the Statute of Frauds; further, there was no merit to the plaintiffs' claim
that, even if they held only a license with respect to lot 8, the evidence
established that the defendant had committed a breach of the license agree-
ment, entitling them to damages. [311-313]

In an action in the Land Court arising from a dispute over the right of plaintiffs
to conduct commercial horseback trail rides over neighboring property
(lots 8 and 10) owned by the defendant, which was once part of the land
where the stables that house the horses used in the trail rides were located,
the judge did not err in determining that an easement over lot 10 was
personal to the individual who offered the trail rides and, therefore, not
available for use by the commercial trail rides business, and that the ease-
ment could not be assigned or transferred by the individual to any other
entity. [313-315]

A Land Court judge did not err in affirming a decision of a town's board of
appeals granting a request by the plaintiff for enforcement of the town's
zoning by-law with respect to commercial horseback trail rides over her
property, where certain delineated harms to the property were more than
sufficient to constitute the plaintiff a person "aggrieved," and where the
trail rides did not constitute a nonconforming use of the lot that was
protected from application of the by-law by G. L. c. 40A, § 6, since the
use was not in existence or begun at the time the by-law was enacted.
[315-317]

[1]Nelson's Riding Stable, Inc.

[2]Charlotte N. Rogel, trustee, and Nelson's Riding Stable, Inc. *vs.* Board of
Appeals of Provincetown and Miriam A. Collinson.

CIVIL ACTIONS commenced in the Land Court Department on April 25, 1996, and October 1, 1996, respectively.

The cases were consolidated and heard by *Leon J. Lombardi, J.*

*Roger S. Davis & Edward T. Patten* for the plaintiffs.

*Edward E. Veara* for Miriam A. Collinson.

MASON, J. Charlotte N. Rogel, trustee of the 43 Race Point Road Trust (trust), and Nelson's Riding Stable, Inc. (Nelson's), appeal from a judgment of the Land Court which (1) determined that they have no easement or other right to use either of two lots of land in Provincetown owned by Miriam A. Collinson for the purpose of conducting commercial horseback riding tours (trail rides) through the area; and (2) affirmed a decision of the board of appeals of Provincetown granting a request by Collinson for enforcement of the Provincetown zoning by-law with respect to the trail rides. We affirm.

*Factual background.* The controversy in this case arises from a dispute over the right of commercial trail rides to pass over neighboring property that was once part of the land where the stables that house the horses used in the trail rides are located. We summarize the facts from the judge's findings and uncontradicted evidence in the record.

In 1948, Rogel's parents, Clifton and Katharine Nelson, acquired a large tract of land in Provincetown that is depicted in part on the assessors' map attached as an appendix to this opinion. The tract included, among other parcels, the stable lot shown on the map, and also lots 8 and 10 shown on the map.

In 1963, Clifton Nelson began offering commercial trail rides from the horse stables located on the stable lot. The rides began at the stable lot, crossed over private land, and then continued on public land, shown on the map, which is now known as the Cape Cod National Seashore (Seashore).

In March, 1966, the planning board approved a definitive subdivision plan creating lots 8 and 10 and other parcels shown on the map. In April, 1970, Nelson's was incorporated and assumed responsibility for operating the trail rides.

In 1972, Miriam Collinson married Robert Collinson, who owned lots 1 and 2 shown on the map and was using them for

operating a recreational area known as Dunes' Edge Campground. In 1978, Robert Collinson died, and Miriam Collinson (hereafter Collinson) became the owner of lots 1 and 2.

Also in 1978, Provincetown adopted a zoning by-law (the 1978 by-law) which, among other things, placed lots 8 and 10, and also the stable lot, into a Class W Residential District (W District). The 1978 by-law listed a stable as a prohibited use in a W District. At the time this by-law was adopted, the trail rides were passing over lots 5 and 6 and also certain property owned by the Cape and Vineyard Electric Company (CVEC property) to access the Seashore.

On June 19, 1981, Clifton and Katharine Nelson conveyed lot 10 to Frank Richards, their attorney, and reserved a forty-foot wide easement running northerly through the center of lot 10 to the Seashore. On that same day, Richards reconveyed lot 10 back to the Nelsons and reserved the same easement. In 1982, Clifton Nelson died and Katharine Nelson (hereafter Nelson) became the sole owner of the stable lot and also lots 8 and 10. At that time, Richards reconveyed to Nelson all of his right, title, and interest in the forty-foot wide easement running through lot 10.

Thereafter, in August, 1983, Nelson conveyed lot 10 to John and Mary Ann Dooley. At that time, Nelson relinquished all her right, title, and interest in the forty-foot wide easement running through lot 10 (which probably had been extinguished when Richards had conveyed it to the owner of lot 10), but reserved to herself a ten-foot wide easement running along the westerly border of lot 10. The deed of conveyance stated that it was

> "[r]eserving unto the Grantor herein a ten (10) foot wide easement to pass and repass on foot and horseback, from Nelson Avenue along the Southwesterly-most portion of the premises by Lot #9 as shown on said plan, and thence turning and running on the northwesterly-most portion of the premises by land now or formerly of Robert Collinson, as shown on said plan."

Sometime prior to November, 1984, Collinson purchased lots 8 and 9, and her mother started living in a house located on lot 8. Subsequently, in November, 1984, Collinson also acquired lot 10 from the Dooleys. The deed of conveyance referred specifi-

cally to the ten-foot wide easement that Nelson had previously reserved.

In the meantime, the trail rides were continuing to pass over lots 5 and 6 and the CVEC property to reach the Seashore. By 1985, however, a stockade fence had been erected on lots 5 and 6, compelling the rides to begin passing over lot 7 to reach the CVEC property and then the Seashore. Then, in 1988, the owner of lot 7 asked the trail rides to stop using his property as he was beginning to construct a home on the property. Thereafter, the trail rides went around lot 7 and used Nelson Avenue to reach the CVEC property and then the Seashore.

At this time, Rogel told Collinson that she had leased the stables and would no longer be personally involved with the trail rides. Rogel asked if Collinson would allow her and a couple of other persons who were then boarding horses at the stables to pass over lot 8 to reach the Seashore. Collinson said that she would do so.

The trail rides subsequently became blocked from using the CVEC property due to the construction of a condominium project and an accompanying fence on the property. As a result, in 1990, Luther Bumps, who was then leasing the stables, obtained Collinson's permission to begin using a path running over the westerly edge of lot 8 to allow the trail rides to reach the Seashore. Subsequently in August, 1992, Wendy Bujack, who was then leasing the stables, asked Collinson if she could continue to use the path running through lot 8 for the trail rides. Collinson agreed to this request but stated that she was doing so only on the conditions that she be named as a co-insured on any insurance policy for the trail rides and that the path over lot 8 be kept clean from waste products left by the horses.

In 1993, Nelson's again resumed operation of the trail rides. At this time, Collinson again consented to the use of the path running through lot 8 for the trail rides, but stated once again that she was doing so only on the conditions that she be named as a co-insured on any insurance policy for the rides and that the path over lot 8 be kept clean and free of waste from the horses. Subsequently, in August, 1993, Rogel paid $286.62 to Collinson to reimburse her for the cost of erecting a post and rail fence along the edge of the path.

Thereafter, in April, 1995, Nelson established the trust, naming Rogel as trustee and herself as sole beneficiary, and conveyed to the trust the stable and two other lots. Shortly thereafter, in June, 1995, Rogel approached Collinson and told her that the path through lot 8 could no longer be used for the horse trails because noise from the neighboring condominiums could cause the horses to become spooked and the horses were also attempting to avoid a muddy condition existing at the end of Nelson Avenue, thereby causing their riders to brush against trees or the fence on the edge of the path. Rogel further told Collinson that, as a result of these problems, Nelson's would have to begin using the ten-foot wide easement over lot 10 for the trail rides. Collinson responded that she would refuse to allow the ten-foot wide easement over lot 10 to be used for the trail rides.

In October, 1995, Nelson conveyed all her right, title and interest in the ten-foot wide easement over lot 10 to the trust. Thereafter, on April 11, 1996, Collinson sent a letter to Rogel stating that Nelson's had been "grossly negligent" in cleaning, maintaining, and supervising the "temporary easement" over lot 8, and that, unless Rogel took immediate action to return the property to its "natural state," Collinson would take such action herself and hold Rogel responsible for the costs. Shortly thereafter, when Collinson did not receive any response to her letter, Collinson put barriers across the path on lot 8 and sent Rogel a further letter stating that she was no longer permitted to use lot 8 because she had failed to keep the property clean.

*Proceedings.* On April 25, 1996, Rogel, as trustee, and Nelson's filed a complaint against Collinson in the Land Court alleging the existence of an easement over lot 10 and that Collinson had been unlawfully interfering with their use of the easement. The complaint sought injunctive relief and damages for the "business losses" caused by Collinson's actions, and also alleged a violation of G. L. c. 93A.

On May 16, 1996, Collinson filed an answer and counterclaims. The counterclaims sought a declaration that the ten-foot easement over lot 10 could not be used for commercial trail rides and also damages caused by the plaintiffs' use of lot 8 for such trail rides. The counterclaims also alleged that the plaintiffs' actions had violated G. L. c. 93A.

The next day, May 17, 1996, Collinson sent a letter to Warren Alexander, the town's building commissioner, stating that the plaintiffs' use of lots 8 and 10 for commercial trail rides violated the 1978 by-law and should be subject to enforcement efforts. After Alexander declined to take action because of the then pending case in the Land Court, and also because lot 10 was not then being traversed, Collinson appealed to the board of appeals (board). Following a public hearing, the board found the following facts, among others:

> "2. While Collinson allowed [the trail rides] to cross [lot 8], no decision was rendered at start of the use about 6 years ago.

> "3. That neighbors along the trail have been subjected to offensive odor, etc.

> "4. That a riding trail is a commercial use.

> "5. That the change of location of the trail from its original pre-existing, nonconforming location to a new location across [lot 8] is a new use that is not allowed the protection of nonconformacy.

> "6. That the intrusion of a commercial horse trail in a residential neighborhood is an unwarranted intrusion. The people who built homes expected a quality of life in this area which is not consistent with this use."

Based on these findings, the board directed the commissioner to enforce the 1978 by-law and order cessation of the trail rides across lot 8. Thereafter, Rogel, as trustee, and Nelson's commenced a second action in the Land Court seeking judicial review of the board's decision pursuant to G. L. c. 40A, § 17. This second action was consolidated with the first action for trial.

At a trial in the Land Court, witnesses included Rogel and Collinson and also Dooley, Bumps, and James Quirk, who was a title examiner for the plaintiffs. The Land Court judge took a view of the properties at issue in the presence of the parties and counsel.

The parties subsequently filed posttrial memoranda on

December 21, 1998. On the same day, the plaintiffs filed a motion to amend their complaint in the first action to add claims that they held an easement over lot 8 or, if the court determined that they held a license rather than an easement, that they were entitled to damages as a result of Collinson's breach of the license agreement. The judge allowed that motion to amend.

The judge thereafter entered his decision in the matter. The judge first ruled that the plaintiffs did not possess an enforceable right to use lot 8 for the commercial trail rides because they had held nothing more than a license that had been properly revoked. The judge rejected Rogel's claim that she held an "oral easement" over lot 8, reasoning that any such claim was barred by the Statute of Frauds, G. L. c. 259, § 1. The judge further ruled that, while Nelson had obtained an easement with respect to lot 10, the language of the easement, as well as the circumstances surrounding its reservation, showed that the easement was an easement in gross, rather than an easement appurtenant to any specific lot, and hence was available only for Nelson's personal use, rather than for the commercial trail rides. Finally, the judge determined that Collinson had standing to appeal to the board from the denial of her enforcement request and that the board had properly determined that the request should have been granted.

In accordance with his decision, the judge caused a judgment to enter enjoining the plaintiffs from subjecting lot 8 to any horse traffic or from entering lot 10, except that Rogel was allowed, with the permission of Nelson, to use on a personal basis the ten-foot wide easement over lot 10 to pass and repass on foot and horseback during Nelson's lifetime. Thereafter, the plaintiffs filed a motion pursuant to Mass.R.Civ.P. 59(e), 365 Mass. 828 (1974), to alter or amend the judgment and then a further motion to amend the motion to alter or amend or, in the alternative, for relief from judgment. The plaintiffs contended in their motions that, as a result of Nelson's transfer of the lot 10 easement to the trust in October, 1995, the judgment should be amended to provide that use of the easement was not limited to Nelson's life. The plaintiffs further contended that certain testimony Collinson had given at trial constituted a "judicial admission" that required the judge to find that she had in fact given Rogel an easement with respect to lot 8.

The judge denied those motions. In an accompanying decision, the judge determined that Nelson had not retained any right to transfer the lot 10 easement to the trust since her reservation of the easement had not used any words of assignability or inheritability. The judge also rejected the plaintiffs' claim that Collinson had made any admission requiring him to find that she had given Rogel an enforceable easement with respect to lot 8.

*Discussion.* An appellate court's "duty is to accept the trial judge's findings of fact unless they are clearly erroneous." *Tamerlane Realty Trust* v. *Board of Appeals of Provincetown*, 23 Mass. App. Ct. 450, 453 (1987). See Mass.R.Civ.P. 52(a), as amended, 423 Mass. 1402 (1996). Legal conclusions drawn from those facts, however, are subject to de novo review. *Bowman* v. *Heller*, 420 Mass. 517, 522 n.6, cert. denied, 516 U.S. 1032 (1995).

1. *Determination of rights regarding lot 8.* The plaintiffs contend that the judge erred in finding that they held nothing more than a license with respect to lot 8 because Collinson's testimony at trial had constituted a judicial admission conclusively establishing that she had given an oral easement with respect to lot 8, and the easement was enforceable notwithstanding the Statute of Frauds because the plaintiffs had both partially performed and relied to their detriment on the alleged agreement by Collinson to grant such an easement by relinquishing their right to use the lot 10 easement. The plaintiffs further contend that, even if the judge properly concluded that they held only a license with respect to lot 8, the evidence established that Collinson had committed a breach of her agreement to grant such a license by revoking the license and, hence, they were entitled to an award of damages for the losses they suffered as a result of this breach.

During cross-examination by counsel for Rogel, Collinson testified as follows:

Q. "You gave Nelson's Riding permission to use a trail along Lot 8 to access the Seashore?"

A. "Right."

Q.  "And, in fact, you called that, in your own words, a verbal easement?"

A.  "Yes, I did, not knowing the correct terminology."

Q.  "Excuse me. Did you call it, in your words, an easement?"

A.  "Yes, I did."

Q.  "And at least according to your testimony, Nelson's had this easement to operate in 1992, 1993 '94 and '95?"

A.  "Uh-huh, as an accommodation."

This testimony did not constitute a judicial admission by Collinson regarding the existence of an easement pertaining to lot 8. The testimony merely acknowledged that Collinson, unschooled in legal terminology, had artlessly used the word "easement" on some prior occasion. This did not constitute a judicial admission of anything, let alone that the oral permission Collinson had given with respect to the use of lot 8 constituted an easement as distinct from a mere revocable license. See *Brown* v. *Metropolitan Transit Authy.*, 345 Mass. 636, 638-639 (1963) (party's prior testimony at auditor's hearing admissible at trial but not binding). See also *Tritsch* v. *Ayer Tanning Co.*, 316 Mass. 598, 602-603 (1944) ("The admission by Burns in his testimony that the correspondence constituted the entire contract does not help the plaintiff [and the remainder of the contract could be shown]. It is still a question of law what was the contract and what is its meaning").

We also agree with the trial judge that the plaintiffs' attempt to enforce the alleged oral easement with respect to lot 8 was barred by the Statute of Frauds.[3] The plaintiffs' argument that the Statute was inapplicable because they had relinquished their right to use the lot 10 easement for the trail rides overlooks that the judge specifically found that the plaintiffs had not relinquished any right they had with respect to lot 10, but had merely refrained from attempting to use it while they were passing over lot 8. This was not enough by itself to constitute sufficient partial performance or detrimental reliance to render the Statute

_____

[3]The Statute provides in pertinent part that no contract for the sale of any interest in land is enforceable unless it is "in writing and signed by the party to be charged therewith or by some person thereunto by him lawfully authorized." G. L. c. 259, § 1.

inapplicable. See, e.g., *Hazelton* v. *Lewis*, 267 Mass. 533, 538-540 (1929); *Barber* v. *Fox*, 36 Mass. App. Ct. 525, 530 (1994).

We also reject the plaintiffs' claim that, even if they held only a license with respect to lot 8, the evidence established that Collinson had committed a breach of the license agreement and, hence, they were entitled to damages. The plaintiffs have failed to cite any such evidence and, hence, this claim has not been argued within the meaning of Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975). In any event, we can discern no merit in the claim. See *Scioscia* v. *Iovieno*, 318 Mass. 601, 603 (1945) (license to use land is "revocable at will").

2. *Determination of rights with respect to lot 10.* The trial judge explicitly recognized that when, as here, an easement has been reserved in the grant of a parcel of land, the easement must be construed with reference to "the deed and the circumstances in which it was made." *Rahilly* v. *Addison*, 350 Mass. 660, 662 (1966). See *Mugar* v. *Massachusetts Bay Transp. Authy.*, 28 Mass. App. Ct. 443, 444 (1990). The judge accordingly based his holding (that the easement reserved by Nelson with respect to lot 10 was an easement in gross and personal to her, rather than an easement appurtenant to the stable or any other lot) not only on the language contained in the 1983 deed from Nelson to the Dooleys, but also on the circumstances existing at the time the deed was given and Nelson's subsequent conduct.

The judge noted particularly that the 1983 deed reserved only to "the Grantor" a "ten (10) foot wide easement to pass and repass on foot and horseback," and contained no further language suggesting that the easement was for the benefit of the stable or any other lot, or that it could be assigned or transferred by the grantor to any other person or entity. The judge further noted that, at the time the 1983 deed was granted, the trail rides were not proceeding over lot 10 but rather, from their inception, had proceeded over lots 5 and 6 and the CVEC property. Finally, the judge noted that, in October, 1995, Nelson separately deeded the easement to the trust, indicating, in light of G. L. c. 183,

§ 15,[4] that she herself regarded the easement as having not been appurtenant to the stable lot which she had previously deeded to the trust.

The plaintiffs nevertheless claim that the judge misconstrued the lot 10 easement as being personal to Nelson, rather than appurtenant to the stable lot, because John Dooley testified that he was told by Rogel that the lot 10 easement was intended for the commercial trail rides and that he, in turn, told this to Collinson when he transferred the lot to her in 1983. It was Nelson, however, rather than Rogel or Dooley, who reserved the easement. Even assuming the testimony of Dooley was nevertheless probative regarding the purpose of the easement, the judge was not required to credit this testimony, and it appears from the absence of any finding with respect to it that he did not do so.[5]

The plaintiffs further contend that, in any event, the judge improperly relied on the absence of any words of assignability or inheritability in the reservation of the easement in holding that it could not be assigned by Nelson since, under G. L. c. 183, § 13, no such words were necessary to render the easement fully assignable. General Laws c. 183, § 13, provides that:

> "In a conveyance or reservation of real estate the terms 'heirs,' 'assigns' or other technical words of inheritance shall not be necessary to convey or reserve an estate in fee. A deed or reservation of real estate shall be construed to convey or reserve an estate in fee simple, unless a different intention clearly appears in the deed."

As the judge noted, however, an easement in gross is "not technically in fee, because an easement in fee must be appurtenant to land held in fee." Jones, Easements § 43 (1898). See *Baseball Pub. Co.* v. *Bruton*, 302 Mass. 54, 57 (1938) (discussing nature of easement in gross). The statute, therefore, does not apply to the type of easement involved in this case.

---

[4]General Laws c. 183, § 15, provides that "[i]n a conveyance of real estate all rights, easements, privileges and appurtances belonging to the granted estate shall be included in the conveyance, unless the contrary shall be stated in the deed, and it shall be unnecessary to enumerate or mention them either generally or specifically."

[5]Collinson denied that Dooley had ever discussed with her the intent of the easement.

We conclude that the judge did not err in determining that the lot 10 easement was personal to Nelson and, therefore, not available for use by the commercial trail rides. See *Doody* v. *Spurr*, 315 Mass. 129, 133-134 (1943); *Socony Mobil Oil Co.* v. *Cottle*, 336 Mass. 192, 197 (1957). The judge likewise did not err in determining that the easement could not be assigned or transferred by Nelson to the trust or to any other entity. See Restatement (Third) of Property (Servitudes) § 1.5 (2000) (easement in gross intended to be personal is not transferable).

3. *Affirmance of board decision.* The plaintiffs claim that Collinson lacked standing to appeal to the board from the denial of her request for enforcement of the 1978 by-law with respect to the commercial trail rides because she was not "aggrieved" by the denial. See G. L. c. 40A, § 8; *Green* v. *Board of Appeals of Provincetown*, 404 Mass. 571, 573 (1989). The judge found, however, that "[w]hen rains fell, strong odors would emanate from the urine and manure in the ground along the path," and that "[d]uring dry periods, the horses would produce a great deal of dust along the path, creating an offensive condition for Ms. Collinson's mother living on lot 8 and for the campers using lot 1." These palpable harms were more than sufficient to constitute Collinson a person "aggrieved" by the denial of her enforcement request. See, e.g., *Cox* v. *Board of Appeals of Carver*, 42 Mass. App. Ct. 422, 424-425 (1997). It is irrelevant that, as the plaintiffs point out, Collinson acceded to the trail rides crossing lot 8 for a period of time prior to her seeking enforcement of the 1978 by-law.

The plaintiffs also claim that, in any event, the board erred in directing the commissioner to enforce the 1978 by-law with respect to the trail rides because the trail rides constituted a nonconforming use of lot 8 which was protected from application of the by-law by G. L. c. 40A, § 6. That statute, as inserted by St. 1975, c. 808, § 3, provides in pertinent part:·

> "Except as hereinafter provided, a zoning ordinance or by-law shall not apply to structures or uses lawfully in existence or lawfully begun . . . but shall apply to any change or substantial extension of such use."

The statute applies on its face only to "uses lawfully in exist-

ence or lawfully begun" at a time a zoning by-law is enacted. It does not protect uses that were not in existence or begun at the time a by-law was enacted.

The plaintiffs nevertheless contend that the statute is applicable because, since 1963, the trail rides have always crossed some private land north of Nelson Avenue on their way to the Seashore. More specifically, the plaintiffs state:

> "Viewed in its entirety, the protected activity is not only the use of 43 Race Point Road [the stable lot] for commercial trail rides but rather it is the entire commercial trail ride activity with all of its components, an integral part of which has always been the use of private land abutting Nelson Avenue as an access route to the National Seashore. If the foregoing definition of the use is applied, the [b]oard's [d]ecision should be annulled."

We could not adopt plaintiffs' proposed definition of the word "use" as it appears in G. L. c. 40A, § 6, without exempting from the 1978 by-law not just lots 8 and 10, but rather every parcel of land north of Nelson Avenue that was at one time part of the stable lot. Indeed, we could not adopt the plaintiffs' proposed definition without exempting from the operation of other local zoning by-laws virtually every parcel of land in the Commonwealth that at one time was connected to, or part of, another parcel containing a nonconforming use which, like the trail rides involved in this case, was capable of changing locations or paths of ingress and egress. We decline to adopt a construction of G. L. c. 40A, § 6, that would lead to such absurd or unreasonable results. See *Champigny* v. *Commonwealth*, 422 Mass. 249, 251 (1996); *North Shore Realty Trust* v. *Commonwealth*, 434 Mass. 109, 112 (2001).

The plaintiffs' reliance on *Barron Chevrolet, Inc.* v. *Danvers*, 419 Mass. 404 (1995), is misplaced. In that case, the court held only that certain commercial signs maintained by an automobile dealership on its property were prior lawful, nonconforming uses or structures protected by G. L. c. 40A, § 6, from the operation of a new zoning by-law permitting only one such sign to be maintained on such property, even though the dealership previously had been required to obtain variances to permit the precise location of the signs on its property. The court did not

suggest that the word "use" as it appears in the statute might be construed in the manner the plaintiffs are now suggesting.

We conclude that the judge did not err in affirming the board's decision.

*Judgment affirmed.*