## A.H. *vs.* M.P.

Middlesex. October 5, 2006. - December 8, 2006.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Parent and Child,* Custody, Child support. *Minor,* Custody, Visitation rights. *Estoppel. Judicial Estoppel. Words,* "De facto parent," "Caretaking."

This court concluded that an adult who was neither the biological nor the adoptive parent of a minor child, but who rather was pursuing parental rights to a child she agreed to have and coparent with her former same-sex partner, could not assert custody and support rights as a "de facto parent," where the judge who denied her claim appropriately weighed factors bearing on the child's best interests, including the child's bond with his primary caretaker — the defendant — while acknowledging that the plaintiff's financial contributions benefited the child. [837-842]

This court declined to recognize the theory of "parent by estoppel" in a custody action. [842-844]

In a custody action brought by an adult who was neither the biological nor the adoptive parent of a minor child, there was no merit to the plaintiff's contention that principles of waiver and judicial estoppel established her claim to be the child's parent. [844-846]

CIVIL ACTION commenced in the Middlesex Division of the Probate and Family Court Department on July 18, 2003.

A motion for temporary child support and visitation was heard by *William F. McSweeny, III,* J., and the case was heard by *Judith Nelson Dilday,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Elizabeth A. Zeldin* (*Anne Robbins* with her) for the plaintiff.

*John Foskett* (*Regina M. Hurley* with him) for the defendant.

The following submitted briefs for amici curiae:

*Karen L. Loewy, Mary L. Bonauto, Nima R. Eshghi,* & *Jennifer L. Levi* for Gay & Lesbian Advocates & Defenders.

*Daniel B. Hogan* for Fathers and Families, Inc.

MARSHALL, C.J. This case raises two questions of first im-

pression. First, whether an adult who is neither the biological nor the adoptive parent of a minor child may assert custody and support rights as a "de facto parent," see *E.N.O* v. *L.M.M.*, 429 Mass. 824, cert. denied, 528 U.S. 1005 (1999); *Youmans* v. *Ramos*, 429 Mass. 774 (1999); and, second, whether and to what extent we should recognize estoppel principles as creating parental rights where the party claiming such rights is neither the biological nor adoptive parent of the child and does not meet the criteria of a de facto parent. See ALI Principles of the Law of Family Dissolution § 2.03 (1) (2002) (defining "parent" to include "de facto parent" and "parent by estoppel").

The plaintiff, A.H., appeals from the judgment of the Probate and Family Court dismissing her verified complaint in equity, see G. L. c. 215, § 6, against the defendant, M.P., her former same-sex partner, for parental rights to the child they agreed during their relationship to have and coparent. The parties separated when the child was eighteen months old. The plaintiff claims on appeal that the Probate and Family Court judge applied erroneously narrow standards for determining de facto parent status, that the defendant is estopped by her behavior during the relationship and her statements during the litigation from asserting that the plaintiff is not the child's de facto parent, that the plaintiff is entitled to "full parental rights" as the child's de facto parent, that the judge erred in not considering the child's best interests, and that the judge's legal conclusions and ultimate findings are not supported by the evidence. We affirm.

At the outset, we note the plaintiff's assertion that this case, the operative facts of which took place before our decision in *Goodridge* v. *Department of Pub. Health*, 440 Mass. 309 (2003), is about ensuring that families in which parents are of the same gender are provided with the same "stabilizing structures" that our laws provide to families with married heterosexual parents. It is not. As the detailed findings, conclusions, and rationale of the judge make clear, this case is about the best interests of the child in circumstances in which one of the parties, in this case the plaintiff, agreed that the major share of the child's caretaking would be undertaken by the other party during their relationship, declined during the course of the relationship to move

forward with adopting the child although she was well aware of the importance of doing so (a refusal that contributed to tension in the relationship), and during a protracted and highly contentious course of litigation was found to have demonstrated an inability to place the child's needs above her own.[1] See *Custody of Kali*, 439 Mass. 834, 840 (2003) (best interests of child is "touchstone inquiry" in custody matters); *E.N.O.* v. *L.M.M.*, *supra* at 828.

The plaintiff's claims implicate the intimate, private right of competent adults to choose, or not to choose, the full responsibilities and obligations of legal parents when they have the means and opportunity to do so, and to do so free from government intrusion. See, e.g., *A.Z.* v. *B.Z.*, 431 Mass. 150, 160, 162 (2000) (private agreement compelling party to become parent against the party's will unenforceable to protect freedom of choice in realm of family life). The record demonstrates that the plaintiff loves the child, and, as the judge found, the child "may very well . . . derive benefits" from his contact with the plaintiff. But these facts are insufficient, in themselves, to accord the plaintiff parental benefits. For the reasons we discuss below, we decline the plaintiff's invitation to erase the distinctions between biological and adoptive parents, on the one hand, and de facto parents, on the other, and to apply estoppel principles to intrude into the private realm of an autonomous, if nonintact, family in which the child's best interests are appropriately taken into consideration.[2]

1. *Background.* a. *Facts.* We summarize the judge's findings, supplemented as appropriate by uncontested evidence of record. We postpone the recitation of some facts to latter portions of this opinion.

The parties began their relationship in 1995, and jointly purchased a home in 1998. After investigating the options for gay and lesbian couples to become parents, they decided that each party should bear a child using the same anonymous sperm donor, with the defendant being the first to conceive. In 2000,

---

[1] At a hearing early in the three-year course of this case, a judge allowed the plaintiff's motion for an order of temporary visitation with the child.

[2] We acknowledge the amicus briefs filed on behalf of Gay & Lesbian Advocates & Defenders and Fathers and Families, Inc.

the defendant began treatment at a Boston fertility clinic. The defendant and the plaintiff listed themselves as "parent 1" and "parent 2," respectively on clinic forms. The child was conceived through in vitro fertilization in January, 2001, and born in October of that year. The plaintiff attended prenatal appointments and parenting classes with the defendant, chose the child's pediatrician, was present at the child's birth, and was authorized by the defendant to make medical decisions on the child's behalf. The parties sent out a joint announcement of the child's birth and in all aspects were a family. The couple decided that the child would take the plaintiff's surname as his middle name, and would call the defendant "Mommy" and the plaintiff "Mama."[3]

The parties contacted an attorney to discuss the plaintiff's adopting the child. The attorney explained the importance of adoption for securing the parental rights of lesbian and gay parents, and the plaintiff understood and appreciated these concerns.[4] The attorney prepared the papers necessary for adoption, including motions to waive notice, a home study, and the six-month waiting period, see, e.g., *Adoption of Galen*, 425 Mass. 201, 203 (1997), and affidavits for friends and relatives of the couple in support of the adoption.[5] Shortly after the child's birth, the attorney forwarded the documents for an

---

[3] The judge noted that whether the child ever referred to the plaintiff as "Mama" during the parties' relationship was disputed at trial, but she made no specific finding on that point.

[4] Others concerned for the parties also advised them that the plaintiff should adopt the child. A mutual friend of the parties, an attorney, testified that she strongly encouraged the couple to proceed with the adoption, as she was aware of a same-sex custody case that became "very ugly."

[5] The attorney simultaneously advised the parties to execute other documents, including wills, healthcare proxies, and powers of attorney. Both parties executed healthcare proxies and powers of attorney, naming each other as primary decision makers. The defendant executed a will naming the plaintiff "as the guardian . . . of any child of mine" in the event of the defendant's death, but the plaintiff did not execute her will until five months after the litigation was commenced, a delay she attributed to the adoption attorney's advice to seek independent legal advice concerning her estate. The plaintiff did, however, designate the defendant as the beneficiary of life insurance policies worth $600,000. The judge found that the plaintiff "acknowledged that the parties' situation as a same-sex couple had significant legal implications, noting that they changed the title to the house because 'the law is so unclear with respect to gay families that I wanted to make sure that should I die, no

expedited adoption process to the parties for their signatures and authorization to file. The defendant reviewed and made changes on several of the legal documents (a process that she testified took approximately forty-five minutes), and completed all the necessary steps she could to expedite the adoption process. The defendant then gave the adoption documents to the plaintiff for her review and action. On at least three separate occasions from November, 2001, to April, 2002, the defendant requested that the plaintiff take action on the adoption documents. At trial the plaintiff acknowledged that the defendant requested that she and her family complete the adoption papers but stated the defendant never set a deadline for the completion of the documents and that she (the plaintiff) viewed the adoption as a formality necessary only in the unlikely event of a "worst case scenario."[6] At trial she likened the defendant's requests to being nagged to do yardwork or laundry and told the defendant to "get off her back." The plaintiff had not reviewed, revised, or signed the adoption papers at the time the parties separated. The judge found that, without impediment, the plaintiff's adoption of the child could have been completed within six months of filing the necessary legal documents.

After the child's birth, the defendant stopped working entirely to take full-time care of the child, an arrangement the parties expected to continue for about one year. The plaintiff took a three-month maternity leave from her job as the coexecutive director of a nonprofit agency, but returned to work after two months. During those two months the plaintiff's contributions to the child's caretaking were at their maximum. She soothed him in the evening when, as frequently happened, he awoke colicky, and she walked him, bathed him, diapered him, and otherwise attended to his well-being. Except for diapering, which was a special routine between the plaintiff and the child, the defendant also performed these caretaking tasks, as well as breast feeding and directing his daily routine and was, in the judge's words, the "final arbiter" in respect to the child's care.

one would remove [the defendant] and [the child] from the house.' "

    [6]The plaintiff stated that she had no sense of urgency to formalize the relationship to the child because she never imagined a possible threat to her parental status.

During the first few months of the child's life, the plaintiff made efforts to reduce the hours of her work schedule and frequent travel that had caused friction between the parties even before the child's birth. However, the defendant reported to the guardians ad litem that, within six months of the child's birth, she became concerned that the plaintiff was not available to, or involved with, the family, and the defendant confided in a family friend that she felt that she was "going it alone." The plaintiff, despite her intentions, soon found herself resuming long hours working away from the home. Inevitably, the plaintiff's activities left the defendant to assume much of the caretaking responsibility for the child.

In March, 2002, the plaintiff's employer lost major funding, plunging the organization into crisis and forcing the plaintiff to lay off employees and to reduce her own pay. The plaintiff testified that, during the subsequent twelve months, she was forced to jettison all nonessential activities, and to devote her full attention and energy to keeping the organization afloat, in the hopes that rescuing the organization would lead to an increase in salary. The plaintiff also testified that during the time when the demands of her job increased, she participated in two triathlons and one half-marathon. The judge did not credit the plaintiff's testimony that, during the same time period, she ran only once a week, and often with the child.

About six or seven months after the child's birth, the plaintiff asked the defendant to return to work. Although this was not what the couple had agreed to, the defendant acquiesced, interviewed and hired a nanny, and returned to work part time from home, beginning in April, 2002. At around this time, the relationship between the parties began to deteriorate markedly. The defendant became increasingly troubled by the plaintiff's long work hours, her failure to complete the adoption papers, and what she saw as the plaintiff's lack of interest in assuming equal responsibility for the child's care, even as she continued to go out with friends and pursue outside hobbies. The defendant reported to one of the guardians ad litem that she "felt that [the plaintiff] took a different view of parenting, treating the child as a 'show-thing' while 'I was raising this kid — we weren't doing this together.' "

By April, 2003, the plaintiff succeeded in placing her organization on firm financial ground, but her efforts, the judge found, "came at the expense" of her relationship with the defendant. That month, the parties separated, and the plaintiff moved out of the home at the defendant's request. Shortly thereafter, they consulted a child development expert and mediator to help them devise a visitation schedule, which they followed until July, 2003. In late July, 2003, the plaintiff announced that she was moving back in to the couple's home. The defendant responded by moving temporarily to her parents' home on Cape Cod, briefly disrupting the plaintiff's visitation schedule.[7] At some time after the parties' breakup, the defendant destroyed the adoption documents that would have permitted the plaintiff to become a legal parent to the child.

b. *Procedural history.* On July 18, 2003, the plaintiff filed a verified complaint in equity for joint legal and physical custody and visitation, seeking to establish her status as a de facto parent, the establishment of custodial rights in accordance with the child's best interests, and an order that she, the plaintiff, pay child support.[8] Thus commenced a fractious course of litigation that, not including the present appeal, resulted in more than three years of legal proceedings, including, among other things, the filing of more than fifty motions, most substantive; dozens of motions hearings; two interlocutory appeals; the filing of a complaint for contempt; the imposition of sanctions; an eleven-day trial; and an appeal to a single justice of this court. We summarize only such portions as are pertinent to our decision.

The plaintiff filed her complaint in equity on July 18, 2003, and the defendant subsequently moved for child support and to resume the visitation schedule that the parties had agreed to

---

[7]The defendant testified that visitation resumed within approximately one week.

[8]On August 7, 2003, the defendant filed an answer and counterclaim in which she sought, among other things, visitation as commensurate with the child's physical and emotional needs, full legal and physical custody, and child support. On May 5, 2004, the plaintiff, with leave, filed an amended complaint in which she described in greater detail the background of the case. On July 22, 2005, the defendant, with leave, filed a late amended answer and a counterclaim for full legal and physical custody, with no child support obligation. It is the amended verified complaint, amended answer, and counterclaim that we consider here.

prior to her temporary relocation to her parents' home. On August 14, 2003, a judge in the Probate and Family Court entered a temporary order for visitation and child support.[9] On May 28, 2004, the judge to whom the case was assigned for trial, who was not the judge who issued the temporary visitation and support order, ordered the appointment of Doctor Margaret Ward and Doctor Mira Levitt as coguardians ad litem (GAL) to investigate whether the child's best interests required continued contact with the plaintiff, and, if so, what kind of contact. The judge specifically instructed the GAL not to investigate issues of custody.[10] See Probate and Family Court Standing Order 1-05, Standards 1.1 and 1.3 for Category F Guardians ad Litem Investigators (2005) (limiting guardian ad litem investigators to gathering and reporting facts that will assist the court in making decisions on custody, visitation, and other matters, in accordance only with the areas for investigation specified in the judge's order).

On June 17, 2004, the defendant moved to vacate the child support order. The defendant's amended motion to vacate the support order, a decision which was originally deferred, was allowed on February 2, 2005, following our decision in *T.F.* v. *B.L.*, 442 Mass. 522 (2004) (declining to impose child support obligation on former same-sex partner who was not the biological or adoptive mother of child in question). The defendant subsequently paid back approximately $9,000 to the plaintiff for child support received. Meanwhile, on July 14, 2004, the plaintiff moved for increased visitation, which was denied.

Also on July 14, 2004, the judge entered an order prohibiting

---

[9]The order, among other things, gave the plaintiff visitation with the child on Mondays and Wednesdays from 9 A.M. until 5 P.M., ordered the plaintiff to pay the mortgage on the joint home and permitted her to use $900 a month from rental income as partial payment of child support, with an additional $285 to be paid each week. The order noted that the parties had represented a willingness for an order of child support to enter.

[10]Specifically, the judge ordered the GAL to address the following issues: "1. Do the health and happiness of the minor child require ongoing contact with [the plaintiff]? 2. In the event that the answer to number 1 . . . is in the affirmative, what contact would promote the child's best interest? 3. As the current state of the law in the Commonwealth does not recognize rights of custody in de facto parents, the Guardians ad litem shall not investigate any issues related to custody."

the parties from coaching the child in preparation for his meetings with the GAL. The plaintiff subsequently appealed from the denial of her motion for increased visitation and the limited scope of the GAL investigation to a single justice of the Appeals Court. On August 11, 2004, the single justice declined to disturb the visitation order, noted that the parties "appear to agree that [the plaintiff] qualifies as a *de facto* parent," rebuffed the plaintiff's efforts to establish custodial rights through an interlocutory appeal, and noted that the order appointing the GAL would inevitably contain considerations relevant to the plaintiff's claims for custodial rights. The GAL submitted their final report, which is discussed below, in May, 2005. The case proceeded to trial.

On July 3, 2006, following the trial, the judge entered a judgment dismissing all of the plaintiff's claims and awarding sole legal and physical custody to the defendant, with any visitation between her and the child left to the defendant's discretion. The judge concluded that, among other things, the plaintiff had failed to meet her burden of proving de facto status. Specifically, she found that the plaintiff's efforts during the relationship toward the child's care were not equal either in quantity or quality to those of the defendant, that the plaintiff had failed to prove that continued contact between the plaintiff and the child was in his best interests, that visitation would not be in the child's best interests because the plaintiff, "in direct contravention of both the parties' previous practices and common sense . . . selectively ignored [the defendant's] directives regarding the child's care and custody," and that the child would not suffer irreparable harm from the severing of his contact with the plaintiff. She also concluded that the plaintiff had no standing to bring claims for either visitation or a support order under any other theory.[11]

We turn now to our discussion of the legal claims.

---

[11]In an attempt to keep the temporary visitation order first entered in August, 2003, in effect while the appeal was pending, the plaintiff moved in the Appeals Court to stay the judgment of the Probate and Family Court pending appeal. A single justice issued a stay pending appeal; she stated in her order "that a substantial case has been presented for viewing the challenged judgment as legally erroneous, an abuse of discretion, and contrary to the child's best interests." While the case was still pending in the Appeals Court,

2. *De facto parent.* We have recognized that, in certain limited circumstances, a child may, with the legal parent's assent, have developed a "significant preexisting relationship" with an adult who is not the child's legal parent "that would allow an inference, when evaluating a child's best interests, that measurable harm would befall the child on the disruption of that relationship." *Care & Protection of Sharlene*, 445 Mass. 756, 767 (2006), and cases cited.[12] One such circumstance exists when the adult who is not the legal parent is found to meet the criteria of a "de facto parent." "A de facto parent is one who has no biological relation to the child, but has participated in the child's life as a member of the child's family. The de facto parent resides with the child and, with the consent and encouragement of the legal parent, performs a share of caretaking functions at least as great as the legal parent. . . . The de facto parent shapes the child's daily routine, addresses his developmental needs, disciplines the child, provides for his education and medical care, and serves as a moral guide." *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829 (1999). See ALI Principles, *supra* at § 2.03 (1) (c) (defining de facto parent).[13] Recognition of de facto parentage lies within the Probate and

the defendant filed a petition in the county court under G. L. c. 211, § 3, seeking relief from the stay, and a single justice denied the petition, stating, "I decline to interfere with the order of the single justice of the Appeals Court. Constant changes at this time cannot be in the child's best interests." The plaintiff thus currently has visitation with the child on the terms set forth in the pretrial temporary order.

[12]It is axiomatic that the touchstone of our child welfare laws is the best interests of the child. The best interests of the child standard, however, is not a catch-all vessel into which any assertion of rights to the care and custody of a child is entitled to flow. In the context of a de facto parent claim, the best interests standard comes into play only after a judge has determined that a "significant preexisting relationship" has created the requisite parent-child attachment that argues for visitation. See, e.g., *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829 (1999).

[13]The ALI Principles define a "de facto parent" as "an individual other than a legal parent or a parent by estoppel who, for a significant period of time not less than two years, (i) lived with the child, and (ii) for reasons other than financial compensation, and with the agreement of a legal parent to form a parent-child relationship, or as a result of a complete failure or inability of any legal parent to perform caretaking functions, (A) regularly performed a majority of the caretaking functions for the child, or (B) regularly performed a share of caretaking functions at least as great as that of the parent with whom the child primarily lived." ALI Principles, *supra* at § 2.03 (1) (c). In *Blixt* v.

Family Court's general equity powers pursuant to G. L. c. 215, § 6, to protect the welfare of minors. See *Youmans* v. *Ramos*, 429 Mass. 774, 783 (1999). It proceeds from the premise "that disruption of a child's preexisting relationship with a nonbiological parent can be potentially harmful to the child," thus warranting State intrusion into the private realm of the family. *Blixt* v. *Blixt*, 437 Mass. 649, 658-659 (2002), cert. denied, 537 U.S. 1189 (2003). A judge has broad discretion to consider any factor that bears on the child's best interests. See *Youmans* v. *Ramos, supra* at 787. Absent clear error, we will not substitute our weighing of the evidence for that of a trial judge who had the opportunity to observe the witnesses and form conclusions about their credibility, even if our weighing of the evidence might have differed from that of the judge. See, e.g., *Adoption of Nancy*, 443 Mass. 512, 514-515 (2005); *Adoption of Hugo*, 428 Mass. 219, 224 (1998), cert. denied sub nom. *Hugo P.* v. *George P.*, 526 U.S. 1034 (1999).

The plaintiff maintains that, in assessing whether the plaintiff met her burden of proving that she was the child's de facto parent, see *Care & Protection of Sharlene, supra,* the judge erred by failing to consider the plaintiff's financial contributions to the family, by adopting a quantitative rather than a qualitative analysis in assessing the parties' respective contributions to the child's care, and by ignoring the parent-by-estoppel principles set forth in the ALI Principles, *supra* at § 2.03 (1)(b). We examine each claim in turn.

The judge found that the plaintiff was the primary "breadwinner" of the family, and that the defendant was the primary caretaker. The plaintiff ascribes error to the fact that the judge

---

*Blixt*, 437 Mass. 649, 659 n.15 (2002), cert. denied, 537 U.S. 1189 (2003), we recognized that the two-year requirement and the requirement of no compensation were refinements to the principle of de facto parenthood that were added to the final version of the ALI Principles. See *Care & Protection of Sharlene*, 445 Mass. 756, 766-767 (2006). Cf. *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 829 & n.6, cert. denied, 528 U.S. 1005 (1999), citing definition of "de facto parent" in ALI Principles; *Youmans* v. *Ramos*, 429 Mass. 774, 776 & n.3 (1999) (same).

The defendant asks that we adopt the two-year requirement for a finding of de facto parent status. In light of our conclusion that the plaintiff has not met her burden on other grounds of proving that she is the child's de facto parent, we express no opinion on the two-year requirement.

did not consider the plaintiff's financial contributions in considering the degree to which the plaintiff was involved in the child's caretaking during the relationship. See *E.N.O.* v. *L.M.M.*, *supra*. There was no error.

We begin with the definition of a de facto parent found in ALI Principles, *supra* at § 2.03, from which our own de facto parent principles derive. See, e.g., note 13, *supra*. The ALI Principles distinguish between general "[p]arenting functions," which are "tasks that serve the needs of the child or the child's residential family," ALI Principles, *supra* at § 2.03 (6), and "[c]aretaking functions," the subset of parenting functions that focuses on "tasks that involve interaction with the child or that direct, arrange, and supervise the interaction and care provided by others." *Id.* at § 2.03 (5). "Parenting functions" that are not "caretaking functions" include, for example, providing financial support and maintaining the home. See *id.* at § 2.03 (6) & comment g, at 125. Caretaking functions "involve the direct delivery of day-to-day care and supervision of the child," including grooming, feeding, medical care, and physical supervision. *Id.* at § 2.03 (5) & comment g.

The distinction between general parenting functions and caretaking is not meant to disparage or discount the role of breadwinners in providing for a child's welfare, as the plaintiff suggests. Rather, the distinction proceeds from the presumption that the parent-child bond grows from the myriad hands-on activities of an adult in tending to a child's needs. Unlike other parenting activities, such as serving on a committee at the child's school or remunerative employment — both of which benefit the child but are not performed directly for him or, usually, in his presence — caretaking tasks "are likely to have a special bearing on the strength and quality of the adult's relationship with the child." ALI Principles, *supra* at § 2.03 comment g. See *id.* at Introduction at 8 ("How caretaking was divided in the past provides a relatively concrete point of reference which is likely to reflect various qualitative factors that are otherwise very hard to measure, including the strength of the emotional ties between the child and each parent, relative parental competencies, and the willingness of each parent to put the child's interests first"). The focus on caretaking in the ALI

Principles is one means by which to anchor the best interests of the child analysis in an objectively reasonable assessment of whether disruption of the adult-child relationship is potentially harmful to the child's best interests. See generally ALI Principles, *supra* at § 2.02 comment b, at 96. And potential harm to the child is, of course, the criterion that tips the balance in favor of continuing contact with a de facto parent against the wishes of the fit legal parent, who has "fundamental liberty interests" in the child's care, custody, and control. *Troxel* v. *Granville*, 530 U.S. 57, 65 (2000); *Youmans* v. *Ramos, supra* at 784, quoting *Lassiter* v. *Department of Social Servs. of Durham County*, 452 U.S. 18, 27 (1981) ("A parent's 'desire for and right to "the companionship, care, custody, and management of his or her children" is an important interest that "undeniably warrants deference and, absent a powerful countervailing interest, protection" ' ").[14]

Our use of the term "caretaking" in cases concerning alleged de facto parent accords with the use of the term in the ALI Principles. See, e.g., *Custody of Kali*, 439 Mass. 834, 842 (2003) ("stability and continuity with the child's primary caregiver is itself an important factor in a child's successful upbringing"); and *id.* at 844, quoting ALI Principles, *supra* at § 2.08 (1) ("custody decisions should reflect each parent's performance of caretaking functions 'before the filing of the action' "); *E.N.O.* v. *L.M.M., supra* at 829; *Youmans* v. *Ramos, supra* at 776. The notion of "caretaking" as the particular subset of parenting tasks having most directly to do with interacting with and on behalf of the child serves as a valuable tool for assessing the

---

[14]Several times during the proceedings, although not in her findings of fact or rationale, the judge expressed concern that the prolonged course of temporary visitation and a GAL investigation, in addition to the parties' litigiousness, could itself become a tool of litigation strategy. We express no opinion on this matter. It need hardly be emphasized that the attorney's ethical duty zealously to represent the client in a custody or visitation matter is not a license to adopt strategies and tactics reasonably likely to create a situation of prolonged destabilization and uncertainty in contravention of the child's best interests. See, e.g., *Care & Protection of Georgette*, 439 Mass. 28, 30 (2003) (noting that vulnerable children "incur harm as the result of unnecessarily waiting for a final determination of status"). Cf. *Youmans* v. *Ramos*, 429 Mass. 774, 786 n.22 (1999) (incumbent on adults to work together to ensure child "not be pulled in different directions or otherwise suffer trauma" because the parties hold different views).

adult's bond with the child. See ALI Principles, *supra* at Introduction. More than parental functions not aligned with "caretaking," it more directly and accurately furthers the principal goal of the de facto parent principle: to prevent trauma to the child, *Youmans* v. *Ramos*, *supra* at 784, that may result from forced rupture of a parent-child bond forged in the "direct delivery of day-to-day care and supervision of the child." ALI Principles, *supra* at § 2.03 comment g. It does not denigrate the importance of an adult's financial contributions to a family, or the role of such contributions in securing the child's welfare, to require that one who is not a legal parent and who invokes the equity powers of the court to establish herself as a de facto parent demonstrate a history of substantial direct, loving, appropriate involvement in the child's supervision and care.[15] Moreover, a judge is free within her broad discretion to consider the impact of parental activity other than caretaking on forming the crucial parent-child bond at the heart of de facto parental status, see *E.N.O.* v. *L.M.M.*, 429 Mass. 824, 831 (1999) (de facto parent's financial contributions to family). Here, the judge specifically found that the plaintiff's financial contributions benefited the child. She also determined, however, that the child's "primary bond" was to his primary caretaker, the defendant, and that the relationship between the plaintiff and the child, however salutary to the child, did not "rise[] to that of a parental relationship." In formulating this conclusion, the judge was free to reject portions of the GAL report and testimony and their recommendations, see *Mason* v. *Coleman*, *ante* 177, 186 (2006), to credit the testimony of the defendant's expert witness as to the deficiencies of the GAL investigation, and to credit the eyewitness testimony of the child's nanny and friends of the parties rather than that of the plaintiff regarding the child's attachment to the parties. See, e.g., *Adoption of Nancy*, 443 Mass. 512, 514-515 (2005). The judge explained her reasoning in detail. We shall not disturb her findings.

Next, the plaintiff alleges that, "[r]ather than focusing on the quality of the relationship" between the plaintiff and the child,

---

[15]From what we have said, it should be clear that the separation of parenting and caretaking functions is not appropriate in the context of a custody dispute between two legal parents. See, e.g., G. L. c. 208, § 28.

the judge "used a rudimentary quantitative analysis" to conclude that, because the plaintiff worked outside the home and provided financial support so that the defendant was able to stay home with the child, the plaintiff "could not" be a parent to the child. We are unpersuaded.

One of the factors that the ALI Principles set out for courts to consider when a nonlegal parent seeks to prove de facto parent status is that the individual "perform[s] a share of caretaking functions at least as great as that of the parent with whom the child primarily lives." ALI Principles, *supra* at § 2.03 (1) (c) (ii) (B). The judge thus quite properly considered the amount of time that the child was in each party's care. To say that the judge then applied this information in a mechanistic fashion, however, is incorrect. In her rationale for the judgment, the judge noted that, in assessing the child's attachment to each party, she considered the "quantity [and] quality" of the parties' caretaking of the child during the relationship. Even a cursory review of the judge's findings reveals that she considered qualitative factors, such as which party deferred to the other in making major decisions concerning the child's care, and which party was able, when interacting with the child, to set the appropriate boundaries. In any event, the focus on the caretaking factor in determining de facto parent status does not preclude a judge from considering, within her broad discretion, any other factor of relevance to determining the child's best interests. There was no error.

3. *Parent by estoppel.* In addition to the arguments raised above, the plaintiff contends that the judge erred in not viewing the evidence through the lens of the parent by estoppel theory. While recognizing biological and adoptive legal parents and de facto parents within the definition of "parents," the ALI Principles also recognize "parent by estoppel." Into this category of parents falls an individual who, in relevant part, although not a legal parent, "(i) is obligated to pay child support . . . or . . . (iii) lived with the child since the child's birth, holding out and accepting full and permanent responsibilities as parent, as part of a prior co-parenting agreement with the child's legal parent . . . to raise a child together each with full parental rights and responsibilities, when the court finds that recognition

of the individual as a parent is in the child's best interests."
ALI Principles, *supra* at § 2.03 (1)(b).[16] There was no error.

The ALI Principles make clear that it is not the third party's
reliance on the words or deeds of the legal parent but the best
interests of the child that is the paramount consideration in the
parent by estoppel analysis. *Id.* at § 2.03 & comment b (iii), at
115. Unlike a de facto parent, a parent by estoppel "is afforded
all of the privileges of a legal parent." *Id.* at § 2.03 comment b.
Thus, the parent by estoppel principle is a most dramatic intru-
sion into the rights of fit parents to care for their child as they
see fit. See, e.g., *Troxel* v. *Granville*, 530 U.S. 59, 65 (2000). It
is perhaps for this reason that the ALI Principles contemplate
that parent by estoppel status is most appropriate where "adop-
tion is not legally available or possible." *Id.* at § 2.03 comment
*b (iii)*, at 114.[17] In this jurisdiction, same-sex couples, like
heterosexual couples, are free to adopt the children of their
partners, see *Adoption of Tammy*, 416 Mass. 205 (1993) (same-
sex partner may adopt child of legal coparent), and, as the
evidence shows, adoption was available to the plaintiff virtually
from the moment of the child's birth.

We decline in this case to accept the plaintiff's invitation to
adopt the parent by estoppel theory. As noted above, a coparent
agreement is the foundation of a parent by estoppel claim.
Private agreement alone does not suffice to create parental

---

[16]Although the plaintiff claims that the temporary order to pay child support
is sufficient to establish her status as a parent by estoppel, and although we
decline to recognize parentage by estoppel, we emphasize that child support
does not create parental rights but rather stems from them. As we discuss
below, the judge who issued the temporary order of child support expressly
declined the plaintiff's request to make a finding that she was a de facto
parent.

[17]ALI Principles, *supra* at § 2.03 (1) (b) (iii), the most relevant definition
of parent by estoppel here, "contemplates the situation of two cohabiting
adults who undertake to raise a child together, with equal rights and
responsibilities as parents. Adoption is the clearer, and thus preferred, legal
avenue for recognition of such parent-child relationships, but adoption is
sometimes not legally available or possible, especially if one of the adults is
still married to another, or if the adults are both women, or both men. Neither
the unavailability of adoption nor the failure to adopt when adoption would
have been available forecloses parent-by-estoppel status. However, the failure
to adopt when adoption was available may be relevant to whether an agree-
ment was intended." ALI Principles, § 2.03 comment b (iii), at 114.

rights in one who is not the child's biological or adoptive parent. In *T.F.* v. *B.L.*, 442 Mass. 522 (2004), we held that, " '[p]arenthood by contract' is not the law in Massachusetts," and contracts entered into to the contrary were void as against public policy. *Id.* at 530. As we explained, "[t]he decision to become, or not to become, a parent is a personal right of 'such delicate and intimate character that direct enforcement . . . by any process of the court should never be attempted.' " *Id.* at 529-530, quoting *Kenyon* v. *Chicopee*, 320 Mass. 528, 534 (1946). See *id.* at 529, and cases cited. See also *id.* at 535 (Greaney, J., concurring in part and dissenting in part) ("parenthood is a status conferred by law and not one that can be conferred by a private agreement to which the child is not [and cannot be] a party"). An express or implied agreement to have or raise a child may be relevant to the parties' intentions, help explain a course of conduct, or otherwise shed light on matters of material import to a custody or visitation determination. Here, the judge found that the parties entered into an agreement to have and raise a child together, and found that the parties' subsequent actions in respect to the agreement to parent jointly illuminate an important source of the couple's conflicts. But evidence of an agreement is not and cannot be dispositive on the issue whether the plaintiff is the child's legal parent. See *id.* at 530. Contrary to the plaintiff's argument, the judge was not required to consider whether the plaintiff met the criteria of a parent by estoppel, and she appropriately did not elaborate at length on her conclusions.[18]

In sum, we find no merit in the plaintiff's assertions that the judge took an erroneously narrow view of the criteria by which to assess the plaintiff's de facto parent claims. We now consider the issue of judicial estoppel.

4. *Judicial estoppel.* In addition to de facto parent and parent by estoppel theories, the plaintiff relies on general principles of waiver and estoppel to establish her claims to be the child's

---

[18]When asked at oral argument to provide a case from any jurisdiction in which "full blown status of parent" was granted under a parent by estoppel theory, the plaintiff's counsel cited to *Matter of the Parentage of L.B.*, 155 Wash. 2d 679 (2005), cert. denied sub nom. *Britain* v. *Carvin*, 126 S. Ct. 2021 (2006), a case that does not grant such rights. We have not been able to locate an appellate case to support such a proposition.

parent. In essence, the plaintiff claims that statements made and actions taken by the defendant and the defendant's counsel before and during the course of litigation amount to a waiver of the defendant's constitutional right, as a fit parent, to make decisions for the child free from government (judicial) interference, and judicially estop the defendant from denying the plaintiff's status as the child's parent.[19] The plaintiff points to, among other things, the defendant's request for child support and visitation in her answer and counterclaim,[20] the defendant's motion for a temporary order of child support, and a statement by the defendant's then-attorney during the course of an emergency hearing in August, 2003, that, "I think there is an acknowledgment of de facto parent status."[21] As noted earlier, the defendant subsequently and successfully moved to vacate the child support order.

" 'Judicial estoppel' . . . precludes a party from asserting a position in one legal proceeding that is contrary to a position it had previously asserted in *another proceeding"* (emphasis added). *Otis* v. *Arbella Mut. Ins. Co.,* 443 Mass. 634, 639-640 (2005), quoting *Blanchette* v. *School Comm. of Westwood,* 427 Mass. 176, 184 (1998). See *Larson* v. *Larson,* 30 Mass. App. Ct. 418, 427-428 (1991). Judicial estoppel is not a principle that automatically prohibits a party from the rather unexceptional practice of assuming inconsistent positions in the same litigation as the facts and the state of the law evolve or as a party changes counsel; *Brown* v. *Quinn,* 406 Mass. 641, 646 (1991), a case on which the plaintiff relies, is not to the contrary. See *Larson* v. *Larson, supra* at 427-428.[22] The application of principles of judicial estoppel is left to the sound discretion of

[19]To the extent that the plaintiff relies on the defendant's actions and statements out of court to prove the existence of a binding agreement to coparent, we have considered and rejected those claims.

[20]In both her original answer and counterclaim and in her amended answer and counterclaim the defendant admitted that it is in the child's best interests to have visitation with the plaintiff "commensurate with the [c]hild's physical and emotional development."

[21]For her part, the defendant points out, correctly, that at the same emergency hearing, the plaintiff's attorney told the judge that the plaintiff "is not coming in looking for significance of a parental role."

[22]The plaintiff does not argue that the statements at issue constitute judicial admissions, see, e.g., *Rogel* v. *Collinson,* 54 Mass. App. Ct. 304, 312 (2002),

the judge based on the facts of the case. *Otis* v. *Arbella Mut. Ins. Co.*, *supra* at 640.

The judge had good reason to reject the plaintiff's judicial estoppel argument. First, as we said above, our courts are loath to create parental status based solely on the parties' use of the operative "magic words." Second, the judge found that the plaintiff's early invocation of the de facto parent theory was made in the course of negotiations with the defendant and that the defendant "is not an authority on the legal significance and/or import of the actions taken by her counsel nor the terms employed." Cf. *Rogel* v. *Collinson*, 54 Mass. App. Ct. 304, 312 (2002) (litigant's "artless[ ]" and "unschooled" use of legal terminology did not constitute a judicial admission). We agree with the judge that, in an evolving area of law, where the significance and legal effect of de facto parentage "remain subject to both debate and further consideration by our higher courts,"[23] legal conclusions concerning de facto parentage are for a judge to determine based on the evidence. Cf. *T.F.* v. *B.L.*, *supra* at 530 n.8 (assuming without deciding that the same public policy that precludes recognition of contractual parenthood applies to theory of parenthood by promissory estoppel). Finally, we find general estoppel principles, while appropriate for commercial transactions, an unwieldy and inappropriate tool by which a judge may probe into the intimate, private realm of family life.

5. *Conclusion.* For the foregoing reasons, the judgment is affirmed.

*So ordered.*

---

and we express no opinion on the matter.

[23]At both the initial emergency hearing in August, 2003, and on the plaintiff's subsequent motion to clarify that order, the motion judge rejected the plaintiff's request to rule, based on the statements of the defendant's then-attorney, that the plaintiff was the child's de facto parent. A single justice of the Appeals Court also denied the plaintiff's request to draw from the defendant's counsel's statements a conclusion of law, prior to trial, that the plaintiff was the child's de facto parent. Throughout much of the litigation, however, the defendant took the position that visitation was detrimental to the child, a conclusion the judge arrived at after trial.